## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

ADT LLC; and The ADT Security
Corporation,

      Plaintiffs,

         v.

Skyline Security Management, Inc.; Edwin
Arroyave; Matthew Haynes; Genaro Nuñez
Hernandez; Robert McGuiness; Juan Ramos;
Karen Romero; Nico VanSlyke,

      Defendants.

Case No. _____

## **COMPLAINT**

For many years, Defendants Skyline Security Management, Inc. ("Skyline"), Edwin Arroyave, Matthew Haynes, Robert McGuiness, Genaro Nuñez Hernandez, Juan Ramos, Karen Romero, and Nico VanSlyke have conspired to steal ADT's proprietary business information in order to poach thousands of ADT customers throughout the United States. Due in no small part to these stolen trade secrets, Defendants were able to identify, target, and then mislead ADT's customers into making changes to their home alarm systems. And through this conduct, Skyline has established itself as a top authorized dealer for Brinks Home Security—a primary ADT competitor—profiting to the tune of millions of dollars.  Plaintiffs ADT LLC and The ADT Security Corporation (together, "ADT"), bring this action to remedy the extensive harm to ADT and its customers alike resulting from Defendants' scheme and to disgorge the millions of dollars of profits derived by Skyline at ADT's expense.

1

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to Section 1331 of Title 28 because it presents a federal question under the Defend Trade Secrets Act and the Lanham Act.

2.      This Court has supplemental jurisdiction over the state-law claims also asserted in this action pursuant to Section 1367(a) of Title 28.

3.      Venue lies in this District pursuant to Section 1391(b) of Title 28 because a substantial number of the events giving rise to the claims asserted in this Complaint occurred in this District.

4.      This Court has personal jurisdiction over all Defendants because they have conspired to commit, and have committed, tortious conduct purposefully directed at this District as described in this Complaint.

5.      As a Florida resident, ADT is injured in Florida by the Defendants' tortious activities.

## FACTS

### I.     The Parties.

6.      Founded in 1874, ADT is the oldest, largest, and best-known provider of electronic security, automation, and smart home services and equipment in the United States.

7.      ADT provides security, automation, and smart-home services and equipment nationwide.

8.      ADT currently has approximately 6.4 million residential subscribers.

9.      ADT's name and trademarks are registered with the United States Patent and Trademark Office.

10.     The ADT Security Corporation owns, *inter alia*, all ADT trademarks, including without limitation 21 ADT live word trademarks featuring the letters "A – D – T," registered in the United States Patent & Trademark Office that bear the registration numbers 3251836, 3352491, 710708, 710507, 3515266, 3511263, 3445423, 3909665, 3485321, 3421797, 1034716, 838956, 803247, 846966, 3348663, 3253804, 3445420, 3991449, 3335239, 3335298, and 3427081 ("ADT Trademarks"). The ADT Security Corporation is ultimately wholly owned by ADT Inc., a Delaware corporation whose common stock is traded on the New York Stock Exchange.

11.     ADT LLC is an operating company that runs the ADT alarm services business in the United States. ADT LLC uses the ADT Trademarks under license from The ADT Security Corporation. ADT LLC is owned by The ADT Security Corporation.

12.     Defendant Skyline is a California corporation with its principal place of business located at 10642 Downey Ave., #205 Downey, CA 90241.

13.     Skyline began selling and installing alarm systems in approximately 2004.  It is an authorized dealer for Brinks Home Security ("Brinks"), the business name of Monitronics International, Inc.

14.     Brinks currently serves over 1 million customers in the United States. Brinks is a direct competitor of ADT in the security systems, automation, and smart home markets.

15.     Today Skyline operates in many states, including Florida.  Skyline is registered to do business in Florida with the Florida Department of State, Division of Corporations and maintains a registered agent in Florida.  Its registered agent in Florida is Cogency Global Inc., 115 North Calhoun St., Suite 4, Tallahassee, FL 32301.

16.     Skyline, as an authorized dealer for Brinks, is also a direct competitor of ADT in the security systems, automation, and smart home markets. ADT and Skyline market and sell

substantially similar goods made by the same suppliers through the same channels to the same target markets of residential consumers. The companies also provide substantially similar security monitoring services to their respective customers. ADT operates in each of the states in which Skyline sells and installs alarm systems.

17.     Defendant Edwin Arroyave is a citizen and resident of California.  He is the founder and chief executive officer of Skyline.

18.     Defendant Matthew Haynes is a citizen and resident of Nevada.  During all relevant times, he was an employee and/or agent of Skyline.

19.     Defendant Genaro Nuñez Hernandez is a citizen and resident of Texas.  During all relevant times, he was an employee and/or agent of Skyline.

20.     Defendant Robert McGuiness is a citizen and resident of New Jersey.

21.     Defendant Juan Ramos is a citizen and resident of Florida. He was employed by ADT initially from November 2014 to 2017, then from January 3, 2022 until October 11, 2023, when his employment was terminated.

22.     Defendant Karen Romero is a citizen and resident of Florida.

23.     Defendant Nico VanSlyke is a citizen and resident of Texas. During all relevant times, he was an employee and/or agent of Skyline.

**II.    <u>The Scheme.</u>**

24.     This case involves a business conspiracy with two distinct, but overlapping, patterns of illegal conduct:

> (a) Stealing and reselling ADT's proprietary business information from its corporate facilities to assist Skyline's sales teams in poaching customers nationwide; and

(b) Targeting ADT's customers with deceptive sales practices throughout Florida and across the country, often by using ADT's misappropriated business information to identify, target and convert ADT customers to Skyline's (*i.e.*, Brinks') services.

25.     Since at least 2018, this pattern of conduct has helped Skyline convert thousands of ADT customers to Skyline/Brinks, resulting in millions of dollars of losses to ADT and millions of dollars of ill-gotten profits for Skyline (and Brinks). Every defendant to this action is jointly and severably liable to ADT as a co-conspirator in the scheme.

### A.   *Misappropriation of ADT's Business Information.*

26.     Information about current residential alarm and home automation customers is highly valuable within the industry. Oftentimes, the most critical factor to effectuating a new sale is overcoming the obstacle of proving that the service is worth the cost.

27.     Accordingly, identifying competitors' customers aids in pinpointing the best targets for new sales because that population has already made the decision to invest in such services. Identifying that information in bulk (as opposed to a home-by-home basis) permits competitors to perfect more efficient sales and marketing strategies for approaching groups of prospective customers.

28.     Similarly, information about customers' current pricing, contract information, equipment, and related account information is also highly valuable to identifying target customers and crafting effective pitches to prospective customers. That information permits competitors to target customers with specific price and equipment proposals that the competitor otherwise may not offer. Further, obtaining that information *in the aggregate* is extremely valuable because it permits a provider to identify specific groups of customers *en masse* to target with specialized sales pitches that would otherwise be impossible without such misappropriated information.

29.     For this reason, ADT (like all providers) keeps its customer information secure and private. The relevant databases are equipped with various security features, including password protection and multi-factor authentication, as well as other types of access controls, such as limiting access only to those select employees who need access to it to perform their duties. It is securely stored in ADT's internal computer systems within its corporate databases.

30.     Recognizing its value to potential ADT competitors, Defendants Ramos and McGuiness devised a scheme to, and did, gain access to ADT's proprietary business information and trade secrets in order to sell this information to ADT's competitors. Defendant Ramos did so by misusing his employee access credentials and after his termination from ADT for stealing proprietary business information, he used the employee access credentials of a former colleague and friend, Philip Kaiser.

31.     This misappropriated and proprietary business information included customer lists and related account information such as terms and duration of the contract, equipment, names of homeowners, contract pricing, and other valuable details about accounts that ADT keeps secure and secret from the general public.

32.     At least as of 2018, Defendants Ramos and McGuiness conspired to, and did, sell to Defendants Skyline, Arroyave, Haynes, Nuñez Hernandez, and/or VanSlyke (together the "Skyline Defendants") ADT's misappropriated business information. The Skyline Defendants acted in concert with Defendants Ramos and/or McGuiness to use the misappropriated business information to financially benefit Skyline or other Skyline Defendants by utilizing the information to make sales of Skyline's (*i.e.*, Brinks') services.

33.     The Skyline Defendants funded Defendant Ramos and McGuiness' theft of proprietary business information. Indeed, the Skyline Defendants purchased ADT's proprietary

business information when they knew or should have known it had been unlawfully obtained, given that the information was kept secret by ADT and known by the Skyline Defendants and within the industry to be highly valuable for successfully obtaining new alarm accounts with prospective customers.

34.     Defendant Karen Romero, the former spouse of Defendant Ramos, aided this scheme by taking payment for the proprietary business information through her PayPal account in an attempt to help conceal the identities of Ramos and potentially other members of the conspiracy.

35.     After purchasing ADT's proprietary business information, the Skyline Defendants would upload the stolen information into a computer application called Spotio, a third-party platform for storing customer information.

36.     Upon information and belief, the stolen ADT propriety business information may extend beyond 500,000 leads. Each was purchased by the Skyline Defendants for approximately $10 to $15 per lead.

37.     Leveraging the misappropriated proprietary business information, Skyline sales agents have targeted ADT customers for conversion to Skyline's (*i.e.*, Brinks') services throughout the country, oftentimes using additional deceptive tactics leading the customer to believe there was some connection or affiliation between Skyline (or its agent) and ADT, as further described below.

38.     Specifically, the Skyline Defendants organized specific sales teams and call centers to target customers identified using ADT's misappropriated business information. These defendants used the information to identify the best potential leads and to craft tailored sales pitches based on the inside information gleaned from ADT's records. That information permitted the Skyline Defendants to convert scores of customers to switch services at a much higher

conversion rate and a much lower customer acquisition cost than otherwise would have been possible without it.

39.     Both the Florida Uniform Trade Secrets Act and the Federal Defend Trade Secrets Act expressly prohibit the theft and misappropriation this type of proprietary business information. *E.g.*, *Freedom Med., Inc. v. Sewpersaud*, 469 F. Supp. 3d 1269, 1275 (M.D. Fla. 2020); *Patient Depot, LLC v. Acadia Enterprises, Inc.*, 360 So. 3d 399, 407 (Fla. 4TH DCA 2023).

### B. *Skyline's Deceptive and Misleading Sales Tactics*.

40.     Skyline's tortious activities do not end with the illegal misappropriation and use of ADT's proprietary and confidential business information.

41.     Frequently, and generally in reliance on the misappropriated ADT business information described above, Skyline's sales agents have misrepresented the nature, characteristics, and qualities of their and/or ADT's products and services in a manner that is likely to confuse customers when approaching ADT's customers to make a sale.

42.     Specifically, through well-rehearsed sales tactics known and taught throughout the company, Skyline sales representatives have misled scores of ADT customers into believing, among other things: (1) that the Skyline agent was  simply "updating" or "upgrading" the ADT customer's equipment, when in reality the Skyline agent was switching out the ADT system for a Skyline (i.e., Brinks) system; (2) that ADT has been bought out or is going out of business and that Skyline is taking over ADT accounts; and (3) that Skyline is a subcontractor, installer, or is otherwise affiliated with or acting on behalf of ADT.

43.     These types of affiliation misrepresentations allow Skyline sales representatives to freeride on the goodwill of ADT, damage ADT's name, and lead ADT's customers to do business

with the Skyline Defendants under false pretenses, often resulting in the ADT customer becoming bound into a multi-year contract with Skyline valued in the thousands of dollars.

44.     Skyline's sales agents solicit ADT's customers in door-to-door sales visits to the customers' homes. At the beginning of these visits—and often throughout the sales encounter— the Skyline agents use deceptive sales pitches that are intended to mislead (and that do mislead) ADT's customers into believing they represent ADT, that Skyline is affiliated with ADT, that they are visiting at ADT's direction, that they work for the companies that made the ADT alarm equipment installed in the customers' homes, or that ADT has otherwise blessed the Skyline agents to work on ADT's behalf.

45.     Leveraging ADT's proprietary business information, Skyline's sales agents often communicate with ADT's customers in advance of the in-home visit through calls or text messages indicating that the customer is nearing the end of their contractual term (with ADT), is eligible for an upgrade, and/or is using outdated equipment that needs updating to continue services. Through artful and deceptive wording and omissions, these communications falsely suggest to the customer that there is a connection or affiliation between the source of the contact reaching out to the customer (Skyline) and ADT. There is no such connection or affiliation.

46.     Using these communications to determine customers willing to receive work on their alarm system, the Skyline sales agents and technicians then visit homes to begin converting the customers using various deceptive sales practices.

47.     Moreover, the misappropriated ADT customer information has aided Skyline's sales agents in making these sales: Skyline's agents often address the customer by name and represent knowledge of the customer's system, contract, home, or relatives to help lead the

customer to the mistaken belief that there is a prior relationship between the customer and the (Skyline) representative.

48.     The Skyline Defendants and their agents use these false and misleading pitches to convince ADT's customers to trust them and to grant the agents entry into their homes. Having won the customers' trust by this deception, the agents lead the customers to sign Skyline contracts and install Skyline alarm systems in the often mistaken belief that they are receiving new ADT equipment from ADT, an ADT affiliate, or an ADT successor; that Skyline is assuming the customer's ADT account; or that the customer has no choice but to permit the transaction to go forward if he or she wishes to continue to have operational alarm-monitoring services.

49.     Even where the customer is or becomes aware of a lack of affiliation between Skyline and ADT at the time of the in-person visit, ADT is damaged by Skyline's wrongful use of its proprietary business information because without it, Skyline would not be targeting those specific customers.

### C.   The Scheme Reaches Thousands of Customers throughout the Country.

50.     Skyline's scheme to misappropriate ADT's business information and dupe ADT's customers has affected thousands of consumers dispersed throughout the country.

51.     Since January 2019, ADT has received over 700 well-documented complaints from its customers about Skyline sales agents using deceptive and misleading sales tactics in attempting to convert their accounts.

52.     Attached to this complaint, ADT includes a spreadsheet of these complaints, with the names and sensitive customer information redacted[1], which ADT incorporates by reference as if set forth fully herein. *See* **Exhibit 1**, Spreadsheet of Deceptive Sales Reports about the Skyline

---

[1] Upon entry of an appropriate protective order during discovery, ADT will provide the names and related customer information corresponding to each documented complaint.

Defendants from ADT Customers from January 10, 2019 to February 14, 2024.  The geographic breadth and numerosity of these complaints spanning such an extended period demonstrates the deep-rooted nature of the Defendants' deceptive sales practices and scheme to misappropriate and use ADT's proprietary business information.

53.     The complaints received by ADT also show that Skyline often intentionally targets older customers or other sensitive groups frequently targeted by scammers. Many complaining ADT customers are over the age of 65, are infirm, or have diminished mental capacities.

### D. The Scheme Harms Both ADT and Its Customers Alike—and Gives Skyline an Unfair Business Advantage.

54.     Skyline's deceptive practices injure ADT by causing ADT's customers to listen to their sales pitches, allow Skyline agents entry to their homes under false pretenses, and eventually sign Skyline (Brinks) contracts, uninstall their ADT alarm systems, replace these systems with Skyline's equipment, and terminate the customers' ADT contracts.

55.     Even in cases where the customer is or becomes aware of a lack of affiliation between Skyline and ADT by the close of the sale, ADT is injured by Skyline's false and misleading statements causing initial interest and confusion that, but-for such conduct, would not lead to a successful sale or as many successful sales in the aggregate.

56.     In addition, using ADT's misappropriated business information and trade secrets has permitted Skyline to vastly enhance the efficiencies of its sales teams by allowing Skyline to target those customers most likely to make a change to their services and to then craft specific sales pitches tailored to that customer's existing system and needs, even where the source of the information used by Skyline's sales team is transparent to the customer.

57.     By falsely claiming an affiliation with ADT in sales to consumers, Skyline further injures ADT by taking for Skyline the essential benefit of being an ADT affiliate without paying

any royalty or other consideration to ADT for the claim of affiliation. This is a benefit for which hundreds of *licensed* ADT dealers pay substantial financial consideration to ADT.  Skyline pays nothing by using ADT's name and brand for the benefit of Skyline, and the Skyline Defendants do not abide by ADT's dealer guidelines in so misappropriating a right of affiliation with ADT.

58.     The Skyline sales agents' false sales pitches also injure ADT's goodwill, reputation, and trademarks. Some customers are left with the false belief that ADT is out of business, that ADT has been acquired, that their ADT alarm systems are outdated and vulnerable to burglars, or that Skyline has taken over ADT accounts. Others understand the false pitch for what it is, but reconsider their ADT service because being an ADT customer has made them a target of scammers. Indeed, some customers have reported ceasing all such security services (regardless of provider) as a result of falling victim to these types of false and misleading practices. Predictably, certain customers wrongly blame ADT for the Skyline Defendants' conduct and never come to understand the lack of affiliation between Skyline and ADT.

59.     The constant need to assist ADT customers in fixing problems resulting from the Skyline sales agents' deceptive sales conduct imposes a substantial cost on ADT to maintain and train customer service agents appropriately. In effect, ADT is forced to constantly police Skyline's salespeople.  Defendants are also liable for these costs.

60.     The confusion, both at the outset of, and throughout, a sales transaction harms ADT by allowing Skyline to freeride on ADT's goodwill with its customers to gain their attention and trust. Any of Skyline's later efforts to clarify any lack of ADT affiliation do not cure the confusion that has already occurred at the outset of the transaction—often by leveraging ADT's misappropriated, proprietary business information to identify prospective customers—even in

12

those instances where a customer understands by the end of the sale that she is contracting with Skyline.

61.     In many instances, the customer remains confused as to Skyline's affiliation with ADT until after the sale is completed. Sometimes, the customer figures out Skyline is not actually affiliated with ADT in the middle of the sale, after the customer's ADT system has been removed and Skyline's system has been installed, but by that time the customer does not feel that they have any choice but to continue and finalize the sale in light of the embarrassment of having been duped. Upon information and belief, Skyline's sales representatives sometimes coach customers to answer Skyline's pre-installation survey, and oftentimes pressure the customer to answer questions quickly and without lucid understanding.

62.     As a result of the Defendants' deceptive practices and use of ADT's proprietary business information, a number of ADT customers have confused Skyline sales agents with ADT representatives, and as a result, have unwittingly found themselves with Skyline's alarm systems installed in their homes, and then possessing simultaneous contractual obligations to both Skyline and ADT. In some instances, ADT has been required to send technicians to the deceived customers' houses to reinstall the removed ADT equipment at considerable expense to ADT. In others, the customers retained Skyline's systems and terminated their ADT contracts, often because Skyline makes it too cumbersome and time-consuming for the customer to end the Skyline service despite it being consummated through fraud. In some circumstances, Skyline requires customers to pay substantial contract termination fees without consideration that the customer's contract was acquired through false and deceptive means.

63.     Customers often blame themselves for falling victim to Skyline's false and misleading sales tactics. Such self-blame also contributes to an under-reporting of deceptive sales

conduct by Skyline. This self-blame also harms ADT's goodwill and reputation because customers believe they never would have fallen victim if they did not have an ADT system in their home in the first place.

64.     This conduct also violates the security systems industry's own Code of Ethics and Standards of Conduct, which requires that companies "truthfully and clearly identify themselves by name . . . at the initiation of a sales presentation, without request from the consumer," and which prohibits as common deceptive sales practices, *inter alia*, (a) any claim that a competitor is going out of business, (b) any claim that the company is taking over the competitor's accounts, or (c) any offer of an "update" or "upgrade" of an existing system that requires the execution of a contract with a new security services provider.

65.     ADT has been fighting these problems for many years. The conduct not only harms ADT and its customers, it harms the entire industry by causing the consuming public to distrust home alarm providers—companies which make their keep by instilling a sense of security and trust in their customers.

### E.  The Scheme is Knowing and Intentional.

66.     Skyline's conduct is knowing and intentional. At worst, Skyline knowingly teaches and condones these actions by its sales agents. At best, Skyline's management and owner are aware of such conduct but do not take sufficient actions to stop it despite having the ability to do so.

67.     Upon information and belief, some of the worst actors continue to be employed by Skyline despite numerous reports of deceptive conduct by those salespeople. Skyline does not terminate or appropriately discipline such agents because they bring substantial revenue streams to Skyline. Instead, Skyline engages in performative window dressing to address this conduct,

providing half-hearted discouragement of such practices at the initial onboarding of new salespeople and promulgating empty-shell written policies purportedly prohibiting the practices.

68.     In reality, Skyline management condones and even teaches its sales representatives to utilize ADT's propriety business information and to engage in deceptive sales tactics. Skyline has provided its sales teams with a deceptive Takeover Pitch Script for targeting ADT's customers. The script includes information regarding how to leverage ADT's stolen proprietary business information in order to convert ADT's customers.

69.     The individuals knowledgeable of the most lucrative methods for utilizing ADT's proprietary information to successfully pull off deceptive sales practices are promoted in Skyline's sales force and then teach such tactics to new recruits as they are brought in each year. The cycle repeats in contagious fashion.

70.     Upon information and belief, employees and sales agents at Skyline have raised concerns about the Skyline sales teams' use of misappropriated business information and trade secrets and other deceptive sales practices, including specifically to Skyline's CEO, Defendant Arroyave. When confronted with such information, Defendant Arroyave failed to take appropriate action to investigate the concerns and eradicate the conduct. To the contrary, he admonished the Skyline employees who raised these concerns in the first place. Arroyave was thus directly aware that certain Skyline sales agents and employees were improperly obtaining and using ADT's proprietary business information to effectuate sales throughout the country.

71.     There is no indication the Skyline Defendants intend to stop using ADT's trade secrets or engaging in deceptive sales practices, and ADT anticipates by the time of trial, the volume of documented reports about these practices will be even more numerous.

72. The reason the Skyline Defendants' conduct has not stopped is because the Skyline Defendants profit to the tune of millions of dollars off these unfair and illegal practices. Every alarm account the Skyline Defendants acquire through deceptive sales conduct creates a new revenue stream for Skyline, frequently for years beyond the initial term of the new contract.

73. In the big picture, Skyline's profits increase exponentially by acquiring as many accounts as possible through whatever means possible. This is why the Skyline Defendants have conspired to wrongfully obtain ADT's proprietary business information with Defendants Ramos and McGuiness. Indeed, the Skyline Defendants have continued to fund Defendant Ramos and McGuiness' theft of proprietary business information because it is profitable. With that proprietary business information in hand, the Skyline Defendants have been able to expeditiously acquire ADT accounts by targeting consumers who are more willing to enter into an agreement with Skyline because they are already paying for a home security system with ADT.

74. Upon information and belief, Skyline's own internal records will show how widespread and common its theft of trade secrets and deceptive sales practices are. Many ADT customers subject to Skyline's practices never complain to ADT. Rather, upon learning of the Skyline Defendants' fraud, they complain to Skyline (or to Brinks).

75. Similarly, when Skyline successfully converts customers using ADT's proprietary business information and trade secrets, ADT is unaware of it.

76. ADT therefore does not at this time have a complete record of the impact of Defendants' conduct. Skyline is in exclusive possession and control of many such records.

77. The 700-plus documented reports ADT has received since January 2019 are but the tip of the iceberg. It is an accepted (and obvious) tenet of consumer complaint behavior that for every aggrieved customer who reports a deceptive sales practice, many more go uncounted. The

16

complaints that ADT received over the period discussed above are likely indicative of thousands of other occurrences where the customer either does not take the time to complain or never realizes he or she has been duped. Still unknown are the likely many thousands of other customers who were targeted using ADT's misappropriated proprietary business information.

**CLAIMS**

**COUNT I**
**VIOLATION OF FLORIDA'S UNIFORM TRADE SECRETS ACT (Fla. Stat. Ann. §**
**688.001 *et seq*.)**
**(AS TO ALL DEFENDANTS)**

78.     ADT incorporates paragraphs 1 through 77 as if set forth fully herein.

79.     In the course of its regularly conducted business, ADT keeps records related to customer contracts including pricing, contract duration, the types of services purchased by certain customers, and notes related to the service provided to those customers.

80.     ADT stores this information electronically, and access to it requires a password and multi-factor authentication. Access to such information in a format that can exported in other mediums also requires a password and multi-factor authentication.

81.     All Defendants engaged in a conspiracy to steal, purchase, sell, and distribute ADT's proprietary business information for their own financial gain rendering each jointly and severally liable for the acts of the other members of the conspiracy.

82.     ADT derives independent economic value from the fact that its proprietary business information, including the specifics of its customers and pricing model, are not known to competitors, including Skyline, as competitors would misuse this information to try to improperly gain a competitive advantage.

83.     Defendants Ramos and McGuiness accessed ADT proprietary business information, which they each knew was proprietary, confidential, and password protected, and

17

used it for purposes for which they did not have ADT's permission or consent. To access this proprietary business information, Defendant Juan Ramos misused his employee computer credentials while he was still employed by ADT and before he was terminated for stealing and selling proprietary business information. After he was terminated, he began using the employee computer credentials of a friend and former colleague, Philip Kaiser.  Defendant Ramos also caused and/or allowed Defendant McGuiness to obtain this proprietary business information, to which ADT did not consent.

84.     Defendants Ramos and McGuiness sold ADT's proprietary business information to Defendants Skyline, Arroyave, Haynes, Nuñez Hernandez, and/or VanSlyke (the "Skyline Defendants"), who paid for this proprietary business information when they knew or should have known it had been unlawfully obtained.

85.     Each such defendant knew, constructively knew, or should have known of the fact that ADT's trade secret information was wrongly obtained and/or being used by Skyline for Skyline's benefit and to ADT's detriment.

86.     In furtherance of this scheme, Defendant Romero took payment for the proprietary business information through her PayPal account to aid in concealing the identities of other participants, including her former spouse Ramos.

87.     ADT's business was injured by the Defendants' conduct because the stolen proprietary business information was used to target ADT's customers, oftentimes with additional deceptive sales practices, and to interfere with ADT's contracts with its customers.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Defendants for the theft of proprietary business information and award the following relief:

a.   Compensatory damages, in an amount to be established at trial;

b.  Damages from the unjust enrichment caused by the misappropriation pursuant to Fla. Stat. Ann. § 688.004;

c.  A reasonable royalty for a misappropriators' unauthorized disclosure and use of ADT's proprietary business information pursuant to Fla. Stat. Ann. § 688.004;

d.  Exemplary damages pursuant to Fla. Stat. Ann. § 688.005;

e.  Pre- and post-judgment interest;

f.  Attorneys' fees pursuant to Fla. Stat. Ann. § 688.005; and

g.  Such other and further relief as the Court may deem appropriate in the circumstances.

## COUNT II
## VIOLATION OF THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836(b)(1))
### (AS TO ALL DEFENDANTS)

88.   ADT incorporates paragraphs 1 through 77 as if set forth fully herein.

89.   In the course of its regularly conducted business, ADT keeps records related to customer contracts including pricing, contract duration, the types of services purchased by certain customers, and notes related to the service provided to those customers.

90.   This proprietary business information is used in and intended for interstate commerce, as ADT operates throughout the country.

91.   ADT stores this information electronically, and access to it requires a password and multi-factor authentication. Access to such information in a format that can exported in other mediums also requires a password and multi-factor authentication.

92.   All Defendants engaged in a conspiracy to steal, purchase, sell, and distribute ADT's proprietary business information for their own financial gain rendering each jointly and severally liable for the acts of the other members of the conspiracy.

19

93.     ADT derives independent economic value from the fact that its proprietary business information, including the specifics of its customers and pricing model, are not known to competitors, including Skyline, as competitors would misuse this information to try to improperly gain a competitive advantage.

94.     Defendants Ramos and McGuiness accessed and/or otherwise obtained ADT proprietary business information, which they each knew was proprietary, confidential, and password protected and used it for purposes for which they did not have ADT's permission or consent.  To access this proprietary business information, Defendants Juan Ramos misused his employee computer credentials while he was still employed by ADT and before he was terminated for stealing and selling proprietary business information. After he was terminated, he used the employee computer credentials of his friend and colleague, Philip Kaiser.

95.     Defendants Ramos and McGuiness sold ADT's proprietary business information to Defendants Skyline, Arroyave, Haynes, Nuñez Hernandez, and/or VanSlyke (collectively, the "Skyline Defendants"), who paid for this proprietary business information when they knew or should have known it had been unlawfully obtained, thus continuing to fund Defendants Ramos of McGuiness' theft of proprietary business information.

96.     Each such defendant knew, constructively knew, or should have known of the fact that ADT's trade secret information was wrongly obtained and/or being used by Skyline for Skyline's benefit and to ADT's detriment.

97.     In furtherance of this scheme, Defendant Romero took payment for the proprietary business information through her PayPal account to aid in concealing the identities of other participants, including her former spouse, Defendant Ramos.

98.     ADT's business was injured by the Defendants' conduct because the stolen proprietary business information was used to target ADT's customers, oftentimes with additional deceptive sales practices, and to interfere with ADT's contracts with its customers.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Defendants for the theft of proprietary business information and award the following relief:

a.  Compensatory damages, in an amount to be established at trial;

b.  Damages from the unjust enrichment caused by the misappropriation pursuant to 18 U.S.C. § 1836;

c.  A reasonable royalty for a misappropriators' unauthorized disclosure and use of ADT's proprietary business information pursuant to 18 U.S.C. § 1836;

d.  Exemplary damages pursuant to 18 U.S.C. § 1836;

e.  Pre- and post-judgment interest;

f.  Attorneys' fees pursuant to 18 U.S.C. § 1836; and

g.  Such other and further relief as the Court may deem appropriate in the circumstances.

**COUNT III**
**UNFAIR COMPETITION IN VIOLATIONOF THE LANHAM ACT,**
**15 U.S.C. § 1125 (a)(1)(A) and (1)(B)**
**(AS TO DEFENDANTS SKYLINE, ARROYAVE, HAYNES, NUÑEZ HERNANDEZ,**
**AND VANSLYKE – "THE SKYLINE DEFENDANTS")**

99.     ADT incorporates paragraphs 1 through 77 as if set forth fully herein.

100.    The ADT Security Corporation owns the ADT Trademarks. ADT LLC uses the ADT Trademarks under license from The ADT Security Corporation. ADT has used the tradename "ADT" for over a hundred years. ADT and its marks are injured by any effort by the Skyline

Defendants to confuse ADT's customers as to the affiliations of the Skyline Defendants' sales agents with ADT.

101.    The Skyline Defendants' sales agents use false representations of affiliation with ADT to confuse ADT's customers as to the agents' true affiliation, to interest the customers in their pitches, to win the customers' trust, and to gain access to their homes.

102.    In fact, the Skyline Defendants' sales agents do not represent ADT, nor is Skyline itself affiliated in any manner with ADT.

103.    The Skyline Defendants make these false representations to ADT's customers with the intent of deceiving ADT's customers as to a relationship or affiliation with ADT that does not exist, and that has never existed.

104.    These false and misleading statements are likely to confuse consumers regarding Skyline's apparent (but false) affiliation with ADT in the initial stages of a sale. In fact, as documented in the accompanying Exhibit 1, they already have created confusion among consumers and will continue to do so if permitted to continue.

105.    Some ADT customers, initially confused at their doorsteps, eventually realize by the end of the sale that the sales agents represent Skyline, not ADT. But many do not and remain confused at the point of sale, signing contracts with Skyline in the mistaken belief that they are contracting with ADT or one of its affiliates. Even when the customer is initially confused but later comes to understand the sales agent is not affiliated with ADT, ADT is still damaged by Skyline freeriding on ADT's name and brand recognition.

106.    In addition to such affiliation misrepresentations, the Skyline Defendants' sales agents make other false and misleading misrepresentations in their commercial promotion of their services regarding the nature, characteristics, and qualities of Skyline and/or ADT's goods and

services, as detailed more specifically above. These material misrepresentations and omissions divest customers of a full freedom of choice based on true and accurate information and wrongly cause customers to switch their services from ADT to Skyline.

107.    ADT has been and will continue to be damaged as a result of the Skyline Defendants' false representations vis-a-vis the confusion of the market for ADT's goods and services, by the disruption of ADT's relationships with its customers, by the diversion of ADT's customers to the Skyline Defendants, by ADT's lost royalties, by ADT's loss of control of the use of its brand in the market, and by damage to ADT's goodwill and reputation as a reliable provider of security systems.

108.    ADT is entitled to an award of compensatory damages, as well as Defendants' profits, attorney's fees, and the costs of this action pursuant to 15 U.S.C. § 1117(a). The Court, pursuant to the discretion confided to it under this section of the Act, should also consider enhancing these damages to compensate ADT fully for its losses.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against the Skyline Defendants, and award the following relief:

a.   Compensatory damages, in an amount to be established at trial;

b.   An accounting of the Skyline Defendants' profits resulting from its deceptive practices, and payment of such profits to ADT;

c.   Attorney's fees and costs incurred in the prosecution of this action, as provided by 15 U.S.C. § 1117(a);

d.   Pre- and post-judgment interest; and

e.   Such other and further relief as the Court may deem appropriate in the circumstances.

**COUNT IV**
**TRADE SLANDER/COMMERCIAL DISPARAGEMENT**
**(AS TO DEFENDANT SKYLINE, ARROYAVE, HAYNES, NUÑEZ HERNANDEZ, AND
VANSLYKE – "THE SKYLINE DEFENDANTS")**

109.     ADT incorporates paragraphs 1 through 77 as if set forth fully herein.

110.     The Skyline Defendants, through their sales agents, have intentionally made false and misleading statements about ADT and about ADT's products and services in their sales pitches to ADT's customers as alleged herein.

111.     The Skyline Defendants' false and misleading statements demean the quality of ADT's goods and services.

112.     At the time the statements were made, the Skyline Defendants knew the statements to be false.

113.     The statements are defamatory *per se* in that the statements suggest conduct incompatible with the lawful exercise of business.

114.     The statements are injurious and damage ADT in its industry and marketplace by causing ADT to lose sales, profits, and good will; suffer injury to its reputation with consumers; and incur attorney's fees.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against the Skyline Defendants and award the following relief:

a.   Compensatory damages, in an amount to be established at trial;

b.   Punitive damages in a sum sufficient to deter the Skyline Defendants from engaging in further deceptive sales tactics;

c.   Pre- and post-judgment interest; and

d.   Such other and further relief as the Court may deem appropriate in the circumstances.

**COUNT V**
**TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS**
**(AS TO DEFENDANTS SKYLINE, ARROYAVE, HAYNES, NUÑEZ HERNANDEZ,**
**AND VANSLYKE – "THE SKYLINE DEFENDANTS")**

115.    ADT incorporates paragraphs 1 through 77 as if set forth fully herein.

116.    ADT maintains valid and enforceable contracts and business relationships with its customers.

117.    Typically, ADT customers display an ADT sign outside their homes to deter potential burglars and broadcast to the outside world that the home is protected by ADT's alarm system.

118.    The Skyline Defendants are knowledgeable of the contractual and business relationship between ADT and its customers. When the Skyline Defendants' sales agents visit the homes of these individuals, they become (or are already) aware of such relationship and contract by, among other means: the sign displayed in front of the customer's home, talking with the customer, observing the ADT equipment in the customer's home, or through prior research and intelligence conducted on the customer's address regarding existing alarm systems.

119.    Despite knowledge of the customer's contractual and business relationship with ADT, the Skyline Defendants' sales representatives intentionally and without valid justification interfere with such relationship using improper means, by misleading ADT's customers into believing that Skyline represents ADT, that Skyline is affiliated with ADT, that they are visiting at ADT's direction, that they work for the companies that made the ADT alarm equipment installed in the customers' homes, or that ADT has otherwise blessed the Skyline Defendants to work on ADT's behalf. Once the Skyline Defendants' agents induce ADT customers to believe that they have an existing business relationship with ADT, the Skyline Defendants' agents lead customers to sign Skyline contracts and install Skyline alarm systems, misleading ADT customers to believe

25

that they are receiving new ADT equipment from ADT, an ADT affiliate, an ADT successor, that Skyline is assuming the ADT account, or that the customer has no choice but to permit the transaction to go forward if he or she wishes to continue to have operational alarm-monitoring services.  Further, the Skyline Defendants' agents sometimes procure the breach of the ADT contract upon the promise that Skyline will "buy out" the remaining term of their ADT contract by paying to the customer an amount equal to the remaining obligation on their ADT contract.

120.    Upon information and belief, Skyline also offers buyouts to "save" sales procured through deceptive sales conduct in an attempt to pacify the customer.

121.    The customer does not always remit such payment to ADT. Even when the customer does, ADT is damaged because the value of the customer's future account revenue often exceeds the contractual value of the remaining contractual term. For example, absent the Skyline Defendants' improper interference, it is not uncommon for a customer with two years left on his or her ADT contract to remain a loyal and paying customer to ADT for many years beyond the remaining two-years. This is also why the Skyline Defendants wrongfully engage in such buyout practices: the Skyline Defendants' know the value of an alarm account often exceeds the immediate value under the contract.

122.    The Skyline Defendants' intentional and unjustifiable interference with ADT's business relationships have caused ADT to suffer irreparable harm and damages in the form of lost goodwill and lost profits. ADT is damaged by the Skyline Defendants' unlawful conduct by losing revenue streams that otherwise would remain with ADT absent the Skyline Defendants' "buy out" offer.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against the Skyline Defendants and award the following relief:

a.   Compensatory damages, in an amount to be established at trial;

b.   Punitive damages in a sum sufficient to deter the Skyline Defendants from engaging in further deceptive sales tactics;

c.   Pre- and post-judgment interest; and

d.   Such other and further relief as the Court may deem appropriate in the circumstances.

**COUNT VI**
**COMMON LAW UNFAIR COMPETITION**
**(AS TO ALL DEFENDANTS)**

123.   ADT incorporates paragraphs 1 through 77 as if set forth fully herein.

124.   ADT and Skyline compete for a common pool of customers. Both market security, automation, and smart-home services to the same target market of residential customers.

125.   All Defendants have engaged in common law unfair competition by engaging in a conspiracy to steal, purchase, and sell ADT's proprietary business information through improper and deceptive means.

126.   The Skyline Defendants have also engaged in unfair and deceptive misconduct by fielding a staff of sales agents who prey on unsuspecting and sometimes elderly and infirm customers.  These sales agents make false sales pitches to ADT's customers that are designed to mislead them into believing that they are acting on ADT's behalf, when in fact they represent a competitor freeriding on ADT's goodwill to interfere with ADT's contracts with its customers, and to sell and install new Skyline alarm systems.  The sales agents also make other material misrepresentations about ADT's and/or Skyline's as detailed above.

127.   The Defendants' actions are contrary to honest practice in industrial or commercial matters. They are prohibited by the alarm industry's own code of conduct. They are independently

actionable, *inter alia*, as violations of the Defend Trade Secrets Act, violations of the Florida Uniform Trade Secrets Act, violations of the Lanham Act, and tortious interferences with ADT's contractual relationships.

128.    The Defendants' actions are likely to cause confusion among consumers, and in fact already have caused confusion, as demonstrated by Exhibit 1.

129.    The Defendants' actions are also contrary to law because they involve a conspiracy to steal ADT's proprietary business information.

130.    ADT has been injured as a result of the Defendants' actions.

131.    The Defendants' conspiracy to steal ADT's proprietary business information and the Skyline Defendants' sales agents' other false sales pitches at customer doorsteps are knowing and willful. They have continued for many years, and are ongoing.  Accordingly, the Court should award punitive damages in an amount sufficient to deter the Defendants from continuing to engage in unfair competition in the market for electronic security services.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against the Defendants, and award the following relief:

  a.    Compensatory damages, in an amount to be established at trial;

  b.    Punitive damages in a sum sufficient to deter the Defendants from engaging in further unfair competition;

  c.    Attorneys' fees and costs incurred in the prosecution of this action;

  d.    Pre- and post-judgment interest; and

  e.    Such other and further relief as the Court may deem appropriate in the circumstances.

28

**COUNT VII**
**CIVIL CONSPIRACY**
**(AS TO ALL DEFENDANTS)**

132.    ADT incorporates paragraphs 1 through 77 as if set forth fully herein.

133.    As detailed above, Defendants agreed to engage in a conspiracy to steal and profit off ADT's proprietary business information and trade secrets in violation of the Defend Trade Secrets Act, the Florida Uniform Trade Secrets Act, and the common law of unfair competition.

134.    All Defendants agreed to execute and did execute a pattern of unlawful conduct in furtherance of this conspiracy wherein Defendants Ramos and McGuiness stole ADT's proprietary business information, which constituted trade secrets, and sold it to Defendants Skyline, Arroyave, Haynes, Nuñez Hernandez, and/or VanSlyke, who purchased the proprietary business information when they knew or should have known the business information had been unlawfully obtained.

135.    Defendant Romero acted in furtherance of this conspiracy designed to steal proprietary business information by taking payment for the stolen business information through her PayPal account and helping conceal the identities of the other members of the conspiracy, including Ramos.

136.    Also in furtherance of this conspiracy, Defendants Skyline, Arroyave, Haynes, Nuñez Hernandez, and VanSlyke used this unlawfully obtained proprietary business information to cause injury to ADT's business by targeting ADT's customers.  Skyline sales agents have used (and continue to use) deceptive sales pitches that are intended to mislead (and that do mislead) ADT's customers into believing that Skyline represents ADT, that Skyline is affiliated with ADT, that Skyline is visiting at ADT's direction, that Skyline works for the companies that made the ADT alarm equipment installed in the customers' homes, or that ADT has otherwise blessed Skyline to work on ADT's behalf.

137. This conspiracy to steal ADT's trade secrets and profit off stolen trade secrets to interfere with ADT's contracts with its customers has occurred numerous times since January 2019 by the same or substantially the same model described above.

138. ADT' was injured by the Defendants' conduct because the stolen trade secrets were used to target ADT's customers, often with additional deceptive sales practices, and to interfere with ADT's contracts with its customers.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against the Defendants, holding all Defendants jointly and severally liable for the theft of trade secrets under a civil conspiracy theory of liability, and award the following relief:

    a. Compensatory damages, in an amount to be established at trial;

    b. Punitive damages in a sum sufficient to deter the Defendants from engaging in further unfair competition;

    c. Attorneys' fees and costs incurred in the prosecution of this action;

    d. Pre- and post-judgment interest; and

    **e.** Such other and further relief as the Court may deem appropriate in the circumstances.

## JURY DEMAND

ADT demands a trial by jury on all issues so triable.


Dated: February 27, 2024.               Respectfully submitted,

                                      **SHOOK, HARDY & BACON L.L.P.**

                                      By: /s/Jennifer A. McLoone
                                      Jennifer A. McLoone
                                      Florida Bar No. 029234
                                      jmcloone@shb.com
                                      201 S. Biscayne Blvd., #3200

Miami, Florida 33131
Tel: (305) 358-5171
Fax: (305) 358-7470

-and-

Charles C. Eblen (*pro hac vice forthcoming*)
ceblen@shb.com
Jason R. Scott (*pro hac vice forthcoming*)
jscott@shb.com
2555 Grand Blvd.
Kansas City, Missouri 64108
Tel: (816) 474-6550
Fax: (816) 421-5547

-and-

Eric J. Hobbs (*pro hac vice forthcoming*)
ehobbs@shb.com
1660 17th Street, Suite 450
Denver, Colorado 80202
Tel: (303) 285-5300
Fax: (303) 285-5301

-and-

Caroline M. Gieser (*pro hac vice forthcoming*)
cgieser@shb.com
1230 Peachtree Street
Suite 1200
Atlanta, Georgia 30309
Tel: (470) 867-6013
Fax: (470) 867-6001

*Counsel for Plaintiffs ADT LLC and The ADT
Security Corporation*