## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 24-cv-20758-ALTMAN/Lett

**ADT LLC**, *et al.*,

    *Plaintiffs*,

*v.*

**SKYLINE SECURITY MANAGEMENT, INC.**, *et al.*,

    *Defendants*.

_____/

### <u>ORDER</u>

A home-security company sued two of its rivals and their agents, alleging a litany of claims under federal and state law. The Defendants now move to dismiss all ten counts. We referred the motion to U.S. Magistrate Judge Lett. After careful review, we **GRANT in part** and **DENY in part** the motion to dismiss.

### THE FACTS

#### I.    Background

Our Plaintiffs—ADT LLC and The ADT Security Corporation (collectively, "ADT"), incorporated in Delaware and headquartered in Florida—provide "electronic security, automation, and smart home services and equipment" to "approximately 6.4 million residential subscribers." Amended Complaint ("AC") [ECF No. 73] ¶¶ 1, 3. They claim that, "[s]ince at least 2018," two competitors have "targeted ADT throughout the United States, including Florida," via a "business conspiracy" that has "converted thousands of ADT customers" and caused "millions of dollars of losses to ADT and millions of dollars of ill-gotten profits." *Id.* ¶¶ 35–36. One "direct competitor of ADT in the security systems, automation, and smart home markets"—BH Security, LLC, and its parent company Monitronics International, Inc. (collectively, "Brinks"), incorporated in Delaware and

headquartered in Texas—"serves over 1 million customers throughout the United States (including Florida)." *Id.* ¶¶ 7–9, 10–11. Another "direct competitor"—Skyline Security Management, Inc. ("Skyline), incorporated and headquartered in California—is an "authorized exclusive dealer for Brinks" and so "enters into contracts with residential consumers then[ ] . . . sells and assigns those contracts to Brinks to provide service and generate revenue." *Id.* ¶¶ 12–13, 15. "Skyline operates in many states, including Florida," where it is "registered to do business" and "maintains a registered agent." *Id.* ¶ 14.

Those competitors allegedly engaged in "two distinct, but overlapping patterns of illegal conduct": *first*, "[s]tealing and reselling ADT's proprietary business information from its corporate facilities to assist in Skyline's sales teams in poaching customers nationwide to convert them to Skyline/Brinks services"; *second*, "[t]argeting ADT's customers with deceptive sales practices, often by using ADT's misappropriated business information to help identify, target and convert ADT customers to Skyline/Brinks services." *Id.* ¶ 35. We detail the alleged schemes below.

### a.  Stealing and Reselling Proprietary Business Information

The AC alleges that an ADT employee, Juan Ramos, "misus[ed] his employee access credentials" to "gain access to ADT's proprietary business information and trade secrets in order to sell this information to ADT's competitors." *Id.* ¶ 42; *see also id.* ¶ 19. This information included "customer lists and related account information[,] such as terms and duration of the contract, equipment, names of homeowners, contract pricing, and other valuable details about accounts that ADT keeps secure and secret from the general public." *Id.* ¶ 44; *see also id.* ¶ 49 ("[T]he stolen . . . information may extend beyond 500,000 ADT customer leads."); *id.* ¶ 40 ("[I]nformation about customers' current pricing, contract information, equipment, and related account information is . . . highly valuable," as it "permits competitors to target customers with specific price and

equipment proposals [and] . . . to identify specific groups of customers *en masse* to target with specialized sales pitches.").

"[A]t least as of 2018," the AC alleges, Ramos "conspired to, and did sell," the "misappropriated business information" to Skyline and to "Skyline sales managers." *Id.* ¶ 45.[1] Those sales managers included Edwin Arroyave, Skyline's Chief Executive Officer, and Matthew Haynes, Genaro Nuñez Hernandez, and Nico VanSlyke (collectively, the "Individual Defendants"), all of whom, "[d]uring all relevant times," were "employee[s] and/or agent[s] of Skyline." *Id.* ¶¶ 16–18, 21. According to the AC, Skyline and the Individual Defendants (collectively, the "Skyline Defendants") "funded" the "theft" by "purchas[ing]" the information "when they knew or should have known it had been unlawfully obtained." *Id.* ¶ 46. Armed with "ADT's records," the Skyline Defendants "target[ed] ADT customers for conversion to Brinks services throughout the country" by "identify[ing] the best potential leads" and "craft[ing] tailored sales pitches based on the inside information." *Id.* ¶¶ 50–51.

### b. Deceptive Sales Practices

But the "tortious activities did not end with the illegal misappropriation and use of ADT's proprietary and confidential business information." *Id.* ¶ 53. "Frequently," the AC alleges, "both Skyline's and Brinks' sales agents have mispresented the nature, characteristics, and qualities of their and/or ADT's products and services in a manner that is likely to confuse customers when approaching

---

[1] Our Plaintiffs allege that Ramos initially worked alongside "his business associate, Robert McGuiness." AC ¶ 42. "Shortly after ADT became aware of this conduct, on October 11, 2023, ADT terminated Ramos for stealing proprietary business information." *Id.* ¶ 43. But, "[u]nbeknownst to ADT, after being terminated, Ramos began using the employee access credentials of a former colleague and friend, Philip Kaiser." *Ibid.* "ADT performed a subsequent investigation uncovering this information and Kaiser was also terminated on January 11, 2024." *Ibid.* The AC further alleges that Ramos's "former spouse," Karen Romero, "aided this scheme by taking payment for the sale of ADT proprietary business information through her PayPal account in an attempt to help conceal the identities of Ramos and potentially other members of the conspiracy." *Id.* ¶ 47.

ADT's customers to make a sale"—and "often in reliance on the misappropriated ADT business information." *Id.* ¶ 54. "Since January 2019, ADT has received over 800 well-documented complaints from its customers about Skyline sales agents using deceptive and misleading sales tactics in attempting to convert their accounts" and "over 1,100 such complaints from its customers about Brinks' sales representatives." *Id.* ¶ 66.

Those sales agents, as the AC describes it, "solicit ADT's customers in door-to-door sales visits to the customers' homes" by using "deceptive sales pitches that are intended to mislead (and that do mislead) ADT's customers into believing they represent ADT, that Skyline/Brinks is affiliated with ADT, that they are visiting at ADT's direction, that they work for the companies that made the ADT alarm equipment installed in the customers' homes, or that ADT has otherwise blessed the Skyline/Brinks agents to work on ADT's behalf." *Id.* ¶ 57; *see also id.* ¶ 60 ("[A]gents often address the customer by name and represent knowledge of the customer's system, contract, home, or relatives to help lead the customer to the mistaken belief that there is a prior relationship."); *id.* ¶ 69 ("Skyline and Brinks often intentionally target older customers or other sensitive groups."); *id.* ¶ 55 ("[T]hrough well-rehearsed sales tactics known and taught throughout each company, Skyline and Brinks sales representatives have misled scores of ADT customers into believing, among other things: (1) that the Skyline/Brinks agent was simply 'updating' or 'upgrading' the ADT customer's equipment, when in reality the Skyline/Brinks agent was switching out the ADT system for a Skyline/Brinks system; (2) that ADT has been bought out or is going out of business and that Skyline/Brinks is taking over ADT accounts; and (3) that Skyline/Brinks is a subcontractor, installer, or is otherwise affiliated with or acting on behalf of ADT.").

According to the AC, "Skyline and Brinks' management both condone and even teach their sales representatives to utilize ADT's propriet[ar]y business information and/or to engage in deceptive sales tactics." *Id.* ¶ 85. Skyline, for instance, "has provided its sales teams with a deceptive Takeover

Pitch Script," which "includes information regarding how to leverage ADT's stolen proprietary business information in order to convert ADT's customers." *Ibid.* And "despite Brinks' knowledge that Skyline is acquiring accounts through false and deceptive means, as well as through the misappropriation of ADT's confidential business information, Brinks has not taken adequate steps to quell the conduct" and instead "continues to acquire a substantial volume of accounts from Skyline to this day without regard to the illegal manner in which they were attained." *Id.* ¶ 83; *see also id.* ¶ 87 ("[T]he individuals knowledgeable of the most lucrative methods for utilizing ADT's proprietary information to successfully pull off deceptive sales practices are promoted in Skyline's and Brinks' sales forces and sometimes even paid bonuses by Brinks."). The AC alleges that these practices "injure ADT by causing ADT's customers to . . . sign Skyline/Brinks contracts, uninstall their ADT alarm systems, replace those systems with Brinks' equipment, and terminate the customers' ADT contracts." *Id.* ¶ 70; *see also id.* ¶¶ 71, 73 (alleging that, "[e]ven in cases where the customer is or becomes aware of a lack of affiliation between Skyline/Brinks and ADT," ADT sustains injuries to its "goodwill, reputation, and trademarks"). But because "Skyline and Brinks profit to the tune of millions of dollars off these unfair and illegal practices," our Plaintiffs conclude, "[t]here is no indication the Skyline Defendants intend to stop using ADT's trade secret or that they, or Brinks, intend to stop engaging in deceptive sales practices." *Id.* ¶¶ 90–91.

## II.     Procedural History

In February 2024, our Plaintiffs sued Skyline, Arroyave, Haynes, Nuñez Hernandez, VanSlyke, McGuiness, Ramos, and Romero. *See* Complaint [ECF No. 1]. In June 2024, our Plaintiffs filed the AC, adding Brinks to the suit and removing McGuiness. *See* AC at 1.[2] That AC asserts ten counts. Counts I and II allege that the Skyline Defendants, Ramos, and Romero violated Florida's Uniform

---

[2] In May 2024, our Plaintiffs voluntarily dismissed McGuiness from the case. *See* Notice of Voluntary Dismissal [ECF No. 33] at 1.

Trade Secrets Act ("FUTSA"), FLA. STAT. § 688.001 *et seq.*, and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1), respectively. *See id.* ¶¶ 96–118. Counts III and IV allege that Brinks and the Skyline Defendants violated the Lanham Act, 15 U.S.C. §§ 1125 (a)(1)(A)–(B). *See id.* ¶¶ 119–136. Counts V, VI, and VII bring claims for trade slander, tortious interference, and common law unfair competition, respectively, against Brinks and the Skyline Defendants. *See id.* ¶¶ 137–161. Count VIII brings a claim for civil conspiracy against the Skyline Defendants, Ramos, and Romero. *See id.* ¶¶ 162–168. And Counts IX and X assert negligence and unjust-enrichment claims, respectively, against Brinks. *See id.* ¶¶ 169–88.

Our Plaintiffs appended two exhibits to the AC—"spreadsheets [that] document at length the nature and extent of Skyline and Brinks' respective deceptive sales conduct, including the known details about the reported sales encounters, the dates of the incidents, the dates of the reports to ADT, the location of the incidents, and the names of the Skyline/Brinks sale representatives (if known), among other things." AC ¶ 67. Exhibit 1 [ECF No. 73-1] purports to detail Skyline's deceptive conduct between January 1, 2019, and June 13, 2024, and Exhibit 2 [ECF No. 73-2] covers the same material and timeline as to Brinks.[3]

On August 14, 2024, Brinks, Skyline, Arroyave, Haynes, Nuñez Hernandez, and VanSlyke (the "Defendants") jointly filed a Motion to Dismiss (the "MTD") [ECF No. 100].[4] That MTD mounts

---

[3] Although the Plaintiffs note that the Exhibits log information dating back to "January 1, 2019," AC ¶ 67, the Exhibits themselves include information from 2018. *See, e.g.*, Ex. 1 at 1.

[4] Ramos and Romero never joined the MTD. In June 2024, they "terminated" their representation. *See* Motion to Withdraw [ECF No. 80]. So, in July 2024, we ordered them to "file either (1) a notice of appearance or (2) a notice informing the Court that they intend to proceed *pro se*." Omnibus Order [ECF No. 82] at 2. When neither complied with our instructions, we ordered them to show cause for their "refus[al] to participate in this litigation." Order to Show Cause [ECF No. 97] at 1. That too went ignored, so we instructed our Plaintiffs to move for clerk's entry of default against them. *See* August 15, 2024 Paperless Order. Our Plaintiffs did that and obtained an entry of default on August 19, 2024. *See* Clerk's Entry of Default [ECF No. 104]. On August 30, 2024, our Plaintiffs filed a Notice of Joint Liability [ECF No. 110], arguing that Ramos and Romero "share joint and several liability" with the "Skyline Defendants" as to Counts I and II and that "ADT is also

three challenges to the AC. *First*, it argues that we "lack[ ] personal jurisdiction over Skyline, Arroyave, Haynes, VanSlyke, and Nuñez Hernandez." MTD at 1. *Second*, it insists that "much of the AC is time-barred as a matter of law." *Id.* at 2. *Third*, it contends that "[e]ach and every cause of action in the AC falls short of providing the particularity required by Rule 9(b) or even the more lenient Rule 8." *Id.* at 20. The Defendants also appended four exhibits to their MTD—declarations from Arroyave, *see* ECF No. 100-1; Haynes, *see* ECF No. 100-2; VanSlyke, *see* ECF No. 100-3; and Nuñez Hernandez, *see* ECF No. 100-4. On August 28, 2024, our Plaintiffs filed a Response in Opposition to the MTD (the "Response") [ECF No. 106]. And, on September 4, 2024, the Defendants filed their Reply in Support of the MTD (the "Reply") [ECF No. 113].

On October 30, 2024, we referred the MTD to Magistrate Judge Enjolique A. Lett. *See* Order of Referral [ECF No. 126]. On February 3, 2025, Magistrate Judge Lett issued a Report and Recommendation (the "R&R") [ECF No. 141], suggesting that we grant the MTD in part and deny it in part. As to personal jurisdiction, Magistrate Judge Lett recommended that we exercise personal jurisdiction over only Skyline and Brinks, not Arroyave, Haynes, Nuñez Hernandez, and VanSlyke. *See* R&R at 5. As to timeliness, Magistrate Judge Lett recommended that we find Counts I, II, and VIII barred by the applicable statutes of limitations. *See id.* at 25, 26. On the merits, Magistrate Judge Lett recommended that we dismiss Count V without prejudice and Counts IX and X with prejudice. *See id.* at 31, 33–34. Finally, the R&R recommended giving our Plaintiffs leave to amend the AC. *See id.* at 34.

On February 18, 2025, our Plaintiffs, Skyline, and Brinks filed objections to the R&R. *See* ADT Objection [ECF No. 142]; Skyline Objection [ECF No. 143]; Brinks Objection [ECF No. 144]. On

---

entitled to judgment against Ramos and Romero on these causes of action *independent* of the resolution of the claims against the Skyline Defendants." *Id.* at 1. Still, our Plaintiffs requested that we "withhold entering final default judgment against the defaulting parties until . . . liability is resolved against the other (non-defaulting) Defendants." *Id.* at 4.

March 4, 2025, our Plaintiffs filed separate responses opposing Skyline's and Brinks's respective objections. *See* ADT Opposition to Brinks ("ADT Opposition I") [ECF No. 152]; ADT Opposition to Skyline ("ADT Opposition II") [ECF No. 153]. That same day, the Defendants filed a collective response to the Plaintiffs' two objections. *See* Defendants Opposition [ECF No. 154].

On June 4, 2025, we directed the Plaintiffs to file "an affidavit swearing to the provenance and authenticity of Exhibits 1 and 2, the logs of customer complaints taken by down by ADT customer service representatives, and identifying which columns in those exhibits were taken down by the customer services representatives themselves." June 4, 2025 Paperless Order [ECF No. 156] (cleaned up). *See* FED. R. CIV. P. 72(b)(3) ("The district judge may . . . receive further evidence[.]"). The Plaintiffs did so on June 11, 2025. *See* Notice of Filing Affidavit [ECF No. 157]. The MTD is now ripe for resolution.

## THE LAW

"District courts must review *de novo* any part of a magistrate judge's disposition that has been properly objected to." *Finkelstein v. Mount Sinai Med. Ctr. of Fla.*, 2023 WL 6118179, at *1 (S.D. Fla. Sept. 19, 2023) (Altman, J.); *see also* FED. R. CIV. P. 72(b)(3). "When a party timely objects to a magistrate judge's report and recommendation, the district judge must make a *de novo* determination 'of those portions of the report or specified proposed findings or recommendations to which objection is made.'" *Ibid.* (quoting 28 U.S.C. § 636(b)(1)). "But, when no party has timely objected, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Versfelt v. Sanza Food Serv., LLC*, 2022 WL 2439092, at *1 (S.D. Fla. July 5, 2022) (Altman, J.) (quotation marks omitted); *see also Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988) (holding that the "[f]ailure to object to the magistrate's factual findings after notice precludes a later

attack on these findings"). A "district court has broad discretion in reviewing a magistrate judge's report and recommendation." *Williams v. McNeil*, 557 F.3d 1287, 1291 (11th Cir. 2009).

A motion challenging subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) may take the form of either a "facial attack" or a "factual attack." *Lawrence v. Dunbar*, 919 F.2d 1525, 1528 (11th Cir. 1990). "A facial attack on the complaint requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Gainsburg v. Fla. Bar*, 2024 WL 2976742, at *2 (S.D. Fla. June 13, 2024) (Altman, J.) (cleaned up). And a "factual attack . . . challenges the existence of subject matter jurisdiction using material extrinsic from the pleadings, such as affidavits or testimony." *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th Cir. 2008). In considering a factual attack on jurisdiction, "a district court is not limited to an inquiry into undisputed facts; it may hear conflicting evidence and decide for itself the factual issues that determine jurisdiction." *Colonial Pipeline Co. v. Collins*, 921 F.2d 1237, 1243 (11th Cir. 1991).

"To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Megladon, Inc. v. Vill. of Pinecrest*, 661 F. Supp. 3d 1214, 1221 (S.D. Fla. 2023) (Altman, J.) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "In deciding a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff, but legal conclusions without adequate factual support are entitled to no assumption of truth." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016) (cleaned up).

ANALYSIS

The MTD challenges the AC on three grounds. *First*, it argues that we lack personal jurisdiction over the Skyline Defendants. *Second*, it claims that seven of the ten Counts fall outside the relevant limitations periods. *Third*, it says that the AC fails to adequately state claims for relief. We address each challenge below.

## I.      Personal Jurisdiction

"The Supreme Court has recognized two types of personal jurisdiction: general jurisdiction . . . and specific jurisdiction." *SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1228 (11th Cir. 2023). "General jurisdiction lies in the forum where the defendant is domiciled or fairly regarded as at home." *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 12 (2025) (cleaned up). "A court in such a forum may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State." *Ibid.* (cleaned up). "Specific jurisdiction is different: It covers defendants less intimately connected with a State, but only as to a narrower class of claims." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021). "To exercise specific jurisdiction, the defendant must have 'purposefully availed' itself of the privilege of conducting activities—that is, purposefully establishing contacts—in the forum state and there must be a sufficient nexus between those contacts and the litigation." *Jekyll Island-State Park Auth. v. Polygroup Macau Ltd.*, 140 F.4th 1304, 1317 (11th Cir. 2025) (quotation marks omitted).

"[A] federal court generally undertakes a two-step analysis to determine whether there is personal jurisdiction over a nonresident defendant." *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1272 (11th Cir. 2022). *First*, we "determine whether the plaintiff has alleged sufficient facts to subject the defendant to the forum state's long-arm statute." *Ibid. Second*, we "decide whether the exercise of jurisdiction comports with the Due Process Clause of the Fourteenth Amendment." *Ibid.* Here, our Plaintiffs press two theories of personal jurisdiction. As to the Skyline Defendants, the AC alleges that

10

those defendants "have conspired to commit, and have committed, tortious conduct purposefully directed at this District." AC ¶ 25; *see also id.* ¶ 31 ("Defendants Skyline, Arroyave, Haynes, Hernandez, Ramos, Romero, and VanSlyke agreed to participate and participated in a conspiracy to target and mislead customers residing in Florida over 50 times."). As to Brinks, the AC contends that "Brinks has committed tortious conduct purposefully directed at this District . . . because Brinks has benefit[]ed from the tortious conduct committed by Defendants Skyline, Arroyave, Haynes, Hernandez, Ramos, Romero, and VanSlyke in Florida and affecting ADT in Florida and in this District." *Id.* ¶ 26. We consider each theory in turn.

### a.  Skyline

The Magistrate Judge recommended that we exercise personal jurisdiction over Skyline because "Arroyave's affidavit does not rebut the allegations that Skyline operates, conducts, engages in, or carries on business in Florida" or the allegations that the Plaintiffs' claims "arise out of Skyline's business operations in Florida." R&R at 21; *see also ibid.* ("Indeed, Skyline admits to selling its products and services in Florida, and it is the sale of such products and services that gives rise to ADT's claims." (citations omitted)).

Objecting to this finding, Skyline argues that the R&R "fails to distinguish between the alleged activities of independent contractors who have contracted to sell Skyline (and potentially other) security systems versus the alleged activities of Skyline officers or agents." Skyline Obj. at 3; *see also ibid.* ("And relatedly the evidence shows that there is no 'connexity' between the actions of Skyline itself (as opposed to third parties with which Skyline contracts) and the claims in this case."). Our Plaintiffs respond that "Skyline misconstrues the relationship between Skyline and its sales agents by neglecting to acknowledge the clear agency relationship at play," as "Skyline's agents were acting as agents of Skyline when engaging in deceptive sales practices in Florida." ADT Opp. II at 1–2.

As we've said, "[w]e consider two questions in resolving personal jurisdiction: (1) whether personal jurisdiction exists over the nonresident defendant . . . under Florida's long-arm statute, and (2) if so, whether that exercise of jurisdiction would violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013). We'll follow this framework in the sections below.

### i. The Florida Long-Arm Statute

The Plaintiffs rely on FLA. STAT. § 48.193(1)(a)(2), which allows for specific jurisdiction over a nonresident defendant who commits a "tortious act within" Florida.[5] Specifically, the Plaintiffs allege that Skyline—along with the Individual Defendants—engaged in a conspiracy in which "Skyline's sales representatives used ADT's confidential business information to target and mislead ADT's customers . . . residing in Florida over 50 times." AC ¶ 31. And the AC "incorporates by reference" Exhibit 1, which catalogs "over 800 well-documented complaints from . . . customers about Skyline sales agents using deceptive and misleading sales tactics in attempting to convert their accounts." *Id.* ¶¶ 66–67.

---

[5] In responding to the MTD, the Plaintiffs embrace *another* theory of personal jurisdiction—that Skyline "and its agents engag[e] in unlawful, deceptive conduct in the course of conducting business in Florida." Resp. at 3; *see also* FLA. STAT. § 48.193(1)(a)(1) (allowing plaintiffs to establish personal jurisdiction over "any cause of action arising from . . . [o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state"). And the R&R appears to accept that theory. *See* R&R at 21 ("Skyline admits to selling its products and services in Florida, and it is the sale of such products and services that gives rise to ADT's claims. Thus, Skyline is subject to Florida's Long-Arm Statute." (citations omitted)). But we won't. The Plaintiffs' Subsection (1)(a)(1) argument appears *nowhere* in the AC, which alleges instead that the Skyline Defendants "have *conspired* to commit, and have committed, *tortious conduct* purposefully directed at this District." AC ¶ 25 (emphases added). Indeed, the Plaintiffs introduce their Subsection (1)(a)(1) theory *only* in response to the MTD, and "we do not consider anything beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss." *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007); *see also Huls v. Llabona*, 437 F. App'x 830, 832 n.5 (11th Cir. 2011) ("Because [the Plaintiffs] raised this argument for the first time in . . . response to [the] motion to dismiss, instead of seeking leave to file an amended complaint, pursuant to Fed. R. Civ. P. 15(a), it was not properly raised.").

Under Florida law, to plead a viable civil-conspiracy claim, a plaintiff must allege "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to [the] plaintiff as a result of the acts done under the conspiracy." *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997); *see also SkyHop*, 58 F.4th at 1223–24 ("To determine whether [a plaintiff] alleged a tortious act, we must determine whether it stated a claim for its tortious act."). And our Plaintiffs do just that. As to an agreement, the AC alleges that "Defendants Skyline, Arroyave, Hayes, Nuñez Hernandez, VanSlyke, Ramos, and Romero agreed to engage in a conspiracy to steal and profit off ADT's proprietary business information and trade secrets in violation of the Defend Trade Secrets Act, the Florida Uniform Trade Secrets Act, and the common law of unfair competition." AC ¶ 162. As to the unlawful- and overt-act elements, the AC alleges that Ramos "stole ADT's proprietary business information . . . and sold it to Defendants Skyline, Arroyave, Haynes, Nuñez Hernandez, and/or VanSlyke, who purchased the proprietary business information when they knew or should have known the business information had been unlawfully obtained," and "used this unlawfully obtained proprietary business information to cause injury to ADT's business by targeting ADT's customers." *Id.* ¶¶ 163, 165; *see also id.* ¶ 165 ("Skyline sales agents have used (and continue to use) deceptive sales pitches that are intended to mislead (and that do mislead) ADT's customers into believing that Skyline represents ADT[.]"). And, on damages, the AC pleads that "ADT was injured by the conduct . . . because the stolen trade secrets were used to . . . interfere with ADT's contracts with its customers." *Id.* ¶ 167; *see also id.* ¶ 36 ("[T]his pattern of conduct has helped Skyline and Brinks convert thousands of ADT customers to Skyline/Brinks, resulting in millions of dollars of losses to ADT and millions of dollars of ill-gotten profits for both Skyline and Brinks.").

But that's not the end of our inquiry. "For purposes of § 48.193(1)(a)(2), the issue is whether [the] tortious acts caused injury *in* Florida." *Louis Vuitton*, 736 F.3d at 1354 (emphasis added). On this

issue, the Defendants maintain that "there is no connection between the Skyline Defendants and Florida." MTD at 12. We disagree. "In deciding whether a complaint states a claim upon which relief may be granted, we normally consider all documents that are attached to the complaint or incorporated into it by reference." *Gill ex rel. K.C.R. v. Judd*, 941 F.3d 504, 511 (11th Cir. 2019); *see also Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016) ("A district court can generally consider exhibits attached to a complaint in ruling on a motion to dismiss."); *MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*, 40 F.4th 1295, 1303 (11th Cir. 2022) ("The Civil Rules of Procedure provide that an attachment to a complaint generally becomes part of the pleading for all purposes. including for ruling on a motion to dismiss." (cleaned up)). Here, Exhibit 1 details dozens of Florida-specific harms that were allegedly committed by Skyline.

Consider four such allegations. In August 2023, a Homestead customer "was contacted by phone and told that ADT had been bought out by Brinks and [that] she needed to upgrade her equipment." Ex. 1 at 50. That customer then "scheduled" an "installation," only to "discover[ ] later that she'd switched alarm companies." *Ibid.*; *see also ibid.* ("[T]hey said they were with ADT and needed to upgrade her box . . . . She finally figured out and looked on the doorbell and it says Skyline or something."). In March 2023, a Fort Pierce customer complained that "BRINKS changed her system from ADT" and "[t]old her BRINKS is taking over all ADT residential accounts." *Id.* at 36. That same month, in Port St. Lucie, a customer "had [a] sales person come knock on [the] door" and "said that they were with Skyline Security/Brinks and that they were merging with ADT." *Id.* at 36. Wearing a "[p]olo shirt [that] said Skyline Security," the salesperson "attempted to have customer change out his keypad, add an Ipad type device and sign a 60 mos contract" and "told [the customer] he would have to cancel ADT." *Ibid.*; *see also ibid.* ("[S]ales person still tried to continue with customers understanding that ADT was merging with Skyline."). Still *another* Port St. Lucie customer reported in March 2023 that "Brinks Skyline claims to have bought . . . out" ADT. *Id.* at 38; *see also ibid.* ("[T]hey are canvassing

area for adt cust[omers] because brinks security was taking over adt and would not have adequate security because brinks has 4 and 5 g." (cleaned up)).

Subsection (1)(a)(2) requires allegations that "*a* tortious act" was committed in Florida. FLA. STAT. § 48.193(1)(a)(2) (emphasis added). The AC offers more than *fifty* examples of Florida-based tortious acts.[6] And those acts—aimed at siphoning ADT's customers through deceptive means— "relate[] to the . . . cause of action," *Louis Vuitton*, 736 F.3d at 1352, given that our Plaintiffs allege a "conspiracy to steal ADT's trade secrets and profit off stolen trade secrets to interfere with ADT's contracts with its customers," AC ¶ 168; *see also World Media All. Label, Inc. v. Believe SAS*, 2025 WL 2102017, at *2 (11th Cir. July 28, 2025) ("[J]urisdiction under § 48.193(1) requires a 'connexity' or connection between the enumerated activity in Florida and the plaintiff's cause of action." (quotation

---

[6] Other Florida-based examples include incidents in Ocala, *see* Ex. 1 at 36 ("[Y]oung man said something about Skyline . . . . [S]aid ADT is being bought out by [s]ome other companies, like an umbrella."); Naples, *see id.* at 43 ("[S]ays she was adt but says the system needs [to be] swapped out to them."); Tampa, *see id.* at 34 ("Skyline Security told him that Brinks had been purchased by ADT."); Pensacola, *see id.* at 45 ("Brinks/Skyline has deceived me" and "continues to deceive me by making false promises . . . . [T]he same Sales Rep . . . claimed he was affiliated with ADT."); St. Petersburg, *see id.* at 36 ("[S]aid Brinks is taking over ADT . . . . She is 80 years old . . . . I asked if it was Skyline and she said yes."); Lady Lake, *see id.* at 40 ("BRINKS SKYLINE SHOWED UP AT THE DOOR EXPLAINING TO THE CUSTOMER THEY NEED TO UPDATE THE SECURITY SYSTEM AND IT NO LONGER WORKS[.]"); Summerfield, *see id.* at 33 ("Came to her front door, called her by her name and told her that ADT was bought out by Brinks, then proceeded to swap the ADT system for theirs . . . . Skyline was on the hat."); Jacksonville, *see id.* at 35 ("Customer was advised by rep that Brinks was in connec[ti]on with ADT to perform upgrade" and "that cancellation of ADT was automatic due to upgrades[.]"); Hudson, *see ibid.* ("[C]ustomer stated Brinks Skyline came to their door and provided false info to get them signed up."); Seffner, *see id.* at 36 ("[P]olo that said [S]kyline . . . . They came to the door and said they were with ADT."); Homosassa, *see id.* at 33 ("They came to his house and had told his wife that they were with Brinks/ADT and the equipment needed to be replaced . . . . He is sending me an image of the ID. He read the sides and it is [S]kyline."); and Hernando, *see id.* at 34 ("Customer is confused about his switch to Brinks. He is sta[ti]ng he was approached at the door by 2 caucasian brinks agents stating they are associated with adt and he needs to upgrade his keypad and to call adt to cancel. He feels deceived. The contracts states Skyline management incorporated.").

marks omitted)).[7] The AC thus sufficiently alleges that Skyline committed a tortious act—in the form of a civil conspiracy—in Florida.

Resisting this conclusion, the Skyline Defendants advance two main counterarguments. *First*, they insist that the R&R's analysis is "flawed for the independent reason that there is no connexity between Skyline's operations in Florida and Plaintiffs' claims," since "[i]ndependent contracts conduct the sales pitches that give rise to ADT's claims." Skyline Obj. at 9–10. That distinction matters, they tell us, because it means that Skyline itself "took none of the actions in Florida out of which ADT's claims arise." *Id.* at 10. As a preliminary matter, this argument sounds in Subsection (1)(a)(1), even though (as explained above) the Plaintiffs can proceed only under Subsection (1)(a)(2). Even on its own terms, though, this independent-contractor defense falls short. The AC alleges that the salespeople acted as "*agents*" of Skyline and Brinks. AC ¶ 61 (emphasis added); *see also id.* ¶ 33 (alleging that Arroyave "direct[ed] and train[ed] his *employees and agents* to use deceptive sales practices" (emphasis added)). So, whether those salespeople are employees or independent contractors makes no difference at this stage—especially since "independent contractors may indeed become agents depending on the totality of the circumstances." *Villazon v. Prudential Health Care Plan, Inc.*, 843 So. 2d 842, 853 (Fla. 2003); *see also Gradia v. Baptist Hosp., Inc.*, 345 So. 3d 385, 387 (Fla. Dist. Ct. App. 2022) ("A physician's contracted status as an independent contractor does not preclude a finding of

---

[7] That's not to say that *every* allegation finds support in the Exhibits. The AC claims, for instance, that the "Skyline Defendants organized specific sales teams and call centers to target customers identified using ADT's misappropriated business information," but that allegation doesn't appear in Exhibit 1. AC ¶ 51. Still, even if those teams and centers were created *outside* Florida, their effects—sending on-the-ground salespeople to target Floridians—occurred *in* Florida. *See Del Valle*, 56 F.4th at 1272 ("We have consistently held that, under Florida law, a nonresident defendant commits a tortious act in Florida by performing an act outside the state that causes injury within Florida."). What matters for our personal-jurisdiction inquiry is whether the Plaintiffs adequately allege that Skyline committed a tortious act in Florida, that they suffered an injury in Florida, and that the tortious act "gives rise to [the] cause of action." *N. Am. Sugar Indus., Inc. v. Xinjiang Goldwind Sci. & Tech. Co.*, 124 F.4th 1322, 1336 (11th Cir. 2025). And, as we've explained, the Plaintiffs have met each of these elements.

agency."); *Hollingsworth v. Perry*, 570 U.S. 693, 713 (2013) ("An essential element of agency is the principal's right to control the agent's actions." (quotation marks omitted)).

    *Second*, Skyline insists that it "has produced evidence that it took none of the actions in Florida out of which ADT's claims arise" and that "ADT offered no evidence to rebut those facts." Skyline Obj. at 10; *see also id.* at 10–11 ("Skyline has submitted sworn evidence that it did not engage in the wrongful practices that are the basis of Plaintiffs' claims . . . . And ADT has pointedly failed to rebut the sworn affidavits."). But the Exhibits have now been verified. *See* Affidavit of Marcia Gold (the "Gold Affidavit") [ECF No. 157-1] at 1 (attesting to the "provenance and authenticity of Exhibits 1 and 2 to the Amended Complaint"); *see also Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010) ("[I]f the defendant makes a showing of the inapplicability of the long-arm statute, the plaintiff is required to substantiate the jurisdictional allegations in the complaint *by affidavits or other competent proof*, and not merely reiterate the factual allegations in the complaint." (cleaned up)). So, even if Skyline "rebutted ADT's prima face case" by flipping the "burden of submitting contrary evidence," Skyline Obj. at 4–5, the battle of allegations now stands in equilibrium—which means, at this stage of the case, that the Plaintiff prevails. *See Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002) ("Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff."). To hold otherwise would be to ignore the fundamental principle that a "district court does not weigh evidence or make credibility determinations" when deciding whether a plaintiff has satisfied the *prima-facie* test. *Jekyll*, 140 F.4th at 1315.

### ii.  Due Process

    We next consider whether the exercise of personal jurisdiction over Skyline comports with the Constitution. *See Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008) ("If *both* Florida law *and* the United States Constitution permit, the federal district court may exercise jurisdiction over the

nonresident defendant." (emphases added)). "The Due Process Clause requires, in the case of specific personal jurisdiction, that an out-of-state defendant have certain 'minimum contacts' with the forum state." *ECB USA, Inc. v. Savencia Cheese USA, LLC*, 148 F.4th 1332, 1340–41 (11th Cir. 2025) (quotation marks omitted). "An out-of-state defendant has minimum contacts with the forum when (1) the plaintiff's claims 'arise out of or relate to' one of the defendant's contacts with the forum state; (2) the nonresident defendant 'purposefully availed' itself of the privilege of conducting activities within the forum state; and (3) the exercise of personal jurisdiction is in accordance with traditional notions of 'fair play and substantial justice.'" *Id.* at 1341 (quotation marks omitted).

Our Plaintiffs clear all three hurdles. *First*, their claims "arise out of" or "relate to" Skyline's Florida contacts. That standard requires "an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Ford Motor*, 592 U.S. at 359–60 (cleaned up); *see also id.* at 362 (explaining that the *arise-out-of* inquiry "asks about causation," while the *relate-to* inquiry "contemplates that some relationships will support jurisdiction without a causal showing"). Here, a "direct causal relationship" tethers the claims, Skyline, and Florida, since the AC alleges that Skyline deceived specific Floridians into leaving ADT for Brinks—and that Skyline did so (*in person*) on over *fifty* occasions. *Louis Vuitton*, 736 F.3d at 1356. We thus find that the claims arise out of, or at least relate to, Skyline's campaign, which was "targeted at or directed to Florida residents." *Del Valle*, 56 F.4th at 1275.

*Second*, the AC adequately alleges that Skyline committed an intentional tort that was aimed at—and felt within—Florida. "In *intentional* tort cases, there are two applicable tests for determining whether purposeful availment occurred." *Louis Vuitton*, 736 F.3d at 1356. "Under the effects test, a nonresident defendant's single tortious act can establish purposeful availment without regard to whether the defendant had any other contacts with the forum state." *Del Valle*, 56 F.4th at 1276. And, under the minimum-contacts test, personal jurisdiction is proper when a "nonresident defendant has

18

certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *SkyHop*, 58 F.4th at 1228 (cleaned up). Applied here, both tests confer personal jurisdiction over the Skyline Defendants.

Let's begin with the effects test. "Stated in its broadest construction, the effects test requires a showing that the defendant (1) committed an intentional tort (2) that was directly aimed at the forum, (3) causing an injury within the forum that the defendant should have reasonably anticipated." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1221 n.28 (11th Cir. 2009); *see also Calder v. Jones*, 465 U.S. 783, 789 (1984) (explaining that the effects test asks whether a state "is the focal point both of the story and of the harm suffered"). Those three elements are satisfied here. The AC alleges that Skyline committed an intentional tort against more than fifty *specific* Floridians. *See* AC ¶ 31 (alleging that "Skyline, Arroyave, Haynes, Hernandez, Ramos, Romero, and VanSlyke agreed to participate and participated in a conspiracy to target and mislead customers residing in Florida over 50 times"). And it asserts that this conduct injured the Plaintiffs *in* Florida. *See id.* ¶ 167 ("ADT was injured by the conduct . . . because the stolen trade secrets were used to . . . interfere with ADT's contracts with its customers."). These allegations thus suffice to establish, at this stage of the case, that Skyline "committed . . . intentional torts *specifically aimed* at a Florida resident." *Licciardello*, 544 F.3d at 1287 (emphasis added).

We reach a similar result under the minimum-contacts test. "Under the minimum contacts test for purposeful availment, we assess the nonresident defendant's contacts with the forum state and ask whether those contacts: (1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed himself of the privileges of doing business within the forum; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum." *Louis Vuitton*, 736 F.3d at 1357. In so doing, we "identify all contacts between a nonresident defendant and a forum state and ask whether, individually or collectively, those contacts satisfy these criteria." *Ibid.*

As we've discussed, the contacts at issue here—using stolen information to trick the residents of 54 Florida homes into leaving ADT for Brinks—*both* relate to the cause of action *and* involve conduct by which the Defendants availed themselves of Florida business activities. And we think it beyond cavil that a defendant would reasonably anticipate being sued in a state in which it "used . . . deceptive sales pitches . . . intended to mislead (and that do mislead)" residents and where it "interfere[d]" with contracts. AC ¶¶ 165, 167; *see also Lovelady*, 544 F.3d at 1287 ("[W]here a defendant's tortuous conduct is intentionally and purposefully directed at a resident of the forum, the minimum contacts requirement is met, and the defendant should anticipate being haled into court in that forum." (quotation marks omitted)). This purposeful conduct, in other words, "created a substantial connection with the forum state and supports jurisdiction." *Tufts v. Hay*, 977 F.3d 1204, 1212 (11th Cir. 2020) (quotation marks omitted).

*Finally*, Plaintiffs satisfy the third element of the due-process test. "Once it has been established that a defendant has purposefully directed his activities at a particular forum, courts still should determine if the assertion of personal jurisdiction would comport with fair play and substantial justice." *SEC v. Marin*, 982 F.3d 1341, 1350 (11th Cir. 2020). In conducting that analysis, we consider "(1) the burden on the defendant; (2) the forum's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; and (4) the judicial system's interest in resolving the dispute." *Louis Vuitton*, 736 F.3d at 1358. "The plaintiff bears the burden of establishing the first two prongs, and if the plaintiff does so, a defendant must make a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Id.* at 1355.

All the relevant factors support our exercise of personal jurisdiction here. Skyline hasn't argued that litigating in our district yields an "inconvenience" of "a constitutional magnitude." *Diamond Crystal Brands*, 593 F.3d at 1274 (quotation marks omitted); *see also Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 947–48 (11th Cir. 1997) ("[I]t is only in highly unusual cases that

inconvenience will rise to a level of constitutional concern . . . . [D]ue process protections against inconvenient litigation have been substantially relaxed."); *Marin*, 982 F.3d at 1351 ("Flying to Florida is no more unusual . . . than following Duke Ellington's famous counsel to take the A train."). "Florida has a very strong interest in affording its residents a forum to obtain relief from intentional misconduct of nonresidents causing injury in Florida." *Tufts*, 977 F.3d at 1212. ADT is headquartered in Boca Raton, Florida. *See* AC ¶¶ 5–6. And "[t]he judiciary has an interest in efficiently resolving [a] dispute in the forum where an extensive record was established." *Louis Vuitton*, 736 F.3d at 1358.

\*   \*   \*

The Magistrate Judge recommended that we exercise personal jurisdiction over Skyline. We agree—but find personal jurisdiction proper under Subsection (1)(a)(2), *not* Subsection (1)(a)(1). We therefore **OVERRULE** the Skyline Defendants' objection as to our jurisdiction over Skyline.

### b. The Individual Defendants

We next consider whether we can exercise personal jurisdiction over the four Individual Defendants—Arroyave, Haynes, VanSlyke, and Nuñez Hernandez. The Magistrate Judge found that "[t]his Court does not have specific personal jurisdiction over any of the individual defendants because ADT does not put forth sufficient evidence to support jurisdiction." R&R at 8. As to Nuñez Hernandez, the R&R noted that he "submitted a sworn declaration contradicting the allegations," which "successfully rebutted ADT's *prima facie* case," and that "ADT did not put forth a sliver of evidence . . . to rebut Hernandez's affidavit." *Id.* at 11–12. As to VanSlyke and Haynes, the R&R found that "ADT's opposition, once again, provides no evidence to support this Court's jurisdiction." *Id.* at 14–15. With respect to Arroyave, the R&R explained that, "because ADT did not submit evidence demonstrating that Arroyave took any actions, intentional or otherwise, to benefit him personally in order to support jurisdiction over Arroyave," the "corporate shield doctrine operates to protect Defendant Arroyave from this Court's jurisdiction." *Id.* at 17. Finally, the R&R rejected the Plaintiffs'

conspiracy-jurisdiction argument on similar grounds, reasoning that "ADT did not produce *evidence* supporting jurisdiction, and therefore, [that] ADT has not carried its burden to show that personal jurisdiction is proper on the basis of the purported civil conspiracy." *Id.* at 19.

The Plaintiffs believe that the R&R "applies too high of a standard at the motion to dismiss stage" and "ignores ADT's unrebutted allegations that Hernandez, Haynes and VanSlyke committed tortious activity." ADT Obj. at 2. They argue that the R&R "errs in failing to credit ADT's allegations supporting conspiracy jurisdiction over each of these individuals, as well as Defendant Arroyave." *Ibid.* The Skyline Defendants counter that the Individual Defendants "had no relevant contacts with Florida or involvement in the alleged conspiracy" and that "[n]one of them had ever heard of Karen Romero, Robert McGuiness, or Juan Ramos, the alleged co-conspirators, let alone spoken to them or purchased something from them." Skyline Obj. at 3. As a result, the Skyline Defendants insist, the Plaintiffs "did not carry [their] burden." *Id.* at 4; *see also id.* at 3 ("ADT gets the law backwards . . . . It contends that bare allegations trump evidence, and asks the Court to rule accordingly. That is not the law.").

After careful review, we find that we *can* exercise personal jurisdiction over the Individual Defendants. As we explained above, the verified Exhibits—which we must credit—tip the evidence into equipoise.[8] And that equipoise means two things: *first*, that we have personal jurisdiction over

---

[8] Even if the Plaintiffs hadn't verified the Exhibits, we're not convinced at this stage that the declarations the Individual Defendants offered fully undermine the "Plaintiffs' core theory of jurisdiction." Reply at 2. Those declarations purport to establish that the Individual Defendants "have never met, heard of, spoken to, given anything of value to, or received anything, let alone ADT's trade secrets, from Ramos, Romero, or McGuiness." *Ibid.* But the conspiracy described in the AC isn't necessarily that the Individual Defendants *themselves* negotiated with or obtained trade secrets from Ramos, Romero, and McGuiness. *See, e.g.,* AC ¶ 163 (alleging that Ramos "sold it to Defendants Skyline, Arroyave, Haynes, Nuñez Hernandez, *and/or* VanSlyke" (emphasis added)); *id.* ¶ 46 ("[T]he Skyline Defendants purchased ADT's proprietary business information when they knew *or should have known* it had been unlawfully obtained from Defendant Ramos[.]" (emphasis added)). Instead, the AC claims, in relevant part, that the Skyline Defendants "agreed to be, and were, members of a conspiracy to steal, buy, and sell ADT's confidential business information," and that the Individual Defendants "used this unlawfully obtained proprietary business information to cause injury to ADT's business by targeting ADT's customers." *Id.* ¶¶ 27, 165. So, it's possible to accept the declarations and *still* find

Skyline under Subsection (1)(a)(2); and *second*, that the AC adequately alleges that Skyline and the Individual Defendants agreed to "engage in a conspiracy to steal and profit off ADT's proprietary business information and trade secrets in violation of the Defend Trade Secrets Act, the Florida Uniform Trade Secrets Act, and the common law of unfair competition." AC ¶ 162.

Conspiracy jurisdiction operates as "an increasingly popular gloss on personal jurisdiction, where defendants can be subject to personal jurisdiction because a co-conspirator's minimum contacts are imputed to the otherwise remote defendant." Naomi Price & Jason Jarvis, *Conspiracy Jurisdiction*, 76 STAN. L. REV. 403, 405 (2024). And the Eleventh Circuit has "made clear that it recognizes the existence of conspiracy jurisdiction." *Karnas v. Cuban*, 2025 WL 3759241, at *12 (S.D. Fla. Dec. 30, 2025) (Altman, J.); *see, e.g.*, *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1281–82 (11th Cir. 2009) ("Florida courts have held that the state's long-arm statute can support personal jurisdiction over any alleged conspirator where any other co-conspirator commits an act in Florida in furtherance of the conspiracy[.]"). In analyzing "the co-conspirator theory of jurisdiction within Florida's long-arm statute," we begin with a "threshold question"—"whether the allegations of the complaint state a cause of action for conspiracy." *ECB*, 148 F.4th at 1344 (quotation marks omitted). But "Florida law demands more than general statements to satisfy its long-arm statute: a court will decline to apply the co-conspirator theory to extend jurisdiction over nonresidents if the plaintiff fails to plead with specificity any facts supporting the existence of the conspiracy and provides nothing more than vague and conclusory allegations regarding a conspiracy involving the defendants." *Id.* at 1345 (quotation marks omitted).

---

that they fail to rebut *every* aspect of the alleged conspiracy—including, for instance, that "Skyline's sales agents . . . are directed by Defendant Arroyave and trained and led by Defendants Haynes, Nuñez Hernandez, and VanSlyke." *Id.* ¶ 145

"The courts of appeals that have examined the issue more thoroughly have determined that . . . the appropriate test for alleging a conspiracy theory of jurisdiction" requires claiming that "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 86–87 (2d Cir. 2018). Our Plaintiffs do just that. They allege that Skyline and the Individual Defendants "conspired to commit, and have committed, tortious conduct purposefully directed at this District." AC ¶ 25. They allege that Skyline acted in furtherance of the conspiracy. *See, e.g.*, AC ¶ 51 ("[T]he Skyline Defendants organized specific sales teams and call centers to target customers identified using ADT's misappropriated business information[.]"); *id.* ¶ 57 ("Skyline's and Brinks' sales agents . . . use deceptive sales pitches that are intended to mislead (and that do mislead) ADT's customers into believing they represent ADT[.]"). And they allege an agency relationship between Skyline and the Individual Defendants.[9] *See id.* ¶¶ 17–18, 21 (alleging that, "[d]uring all relevant times," Nuñez Hernandez, Haynes, and VanSlyke were each "an employee and/or agent of Skyline"); *id.* ¶¶ 16, 51 ("Arroyave . . . is the founder and chief executive officer of Skyline . . . . Arroyave was directly knowledgeable of, and participated in, these acts."); *id.* ¶ 45 ("The Skyline Defendants acted in concert with Defendant[ ] Ramos to use the misappropriated business information to financially benefit the Skyline Defendants and Brinks[.]").

---

[9] We've elsewhere discussed the "compelling reasons to reexamine the viability of the conspiracy-jurisdiction doctrine" and the fact that "the doctrine stands in tension with the Supreme Court's admonition that each defendant's contacts with the forum State must be assessed *individually*." *Karnas*, 2025 WL 3759241, at *11, *14 n.12 (cleaned up). But we'll repeat here our view that "[t]ethering the doctrine to agency principles prevents conspiracy jurisdiction from swallowing the due-process values that are enshrined in the personal-jurisdiction inquiry" and "allows courts to stay within the parameters carved out by the Supreme Court." *Id.* at *14 n.12 (cleaned up). Exercising conspiracy jurisdiction in this case adheres to that principle, since the Plaintiffs allege an agency relationship between Skyline and the Individual Defendants.

Those allegations suffice to establish conspiracy jurisdiction under current Eleventh Circuit precedent. So, we needn't undergo a separate due-process analysis as to the Individual Defendants, since conspiracy jurisdiction sweeps within the court's ambit defendants who otherwise lack traditional minimum contacts.[10] *See Wilcox v. Stout*, 637 So. 2d 335, 337 (Fla. Dist. Ct. App. 1994) (holding that, if a plaintiff "has successfully alleged that *any* member of that conspiracy committed tortious acts in Florida in furtherance of that conspiracy, then *all* of the conspirators are subject to the jurisdiction of the state of Florida" (emphases added)). We therefore **SUSTAIN** the Plaintiffs' objection as to our jurisdiction over the Individual Defendants.

### c. Brinks

Finally, we can exercise personal jurisdiction over Brinks without reaching the merits of the Plaintiffs' arguments because Brinks hasn't challenged personal jurisdiction. *See* Resp. at 4 ("[N]either Brinks entity named in this suit challenges personal jurisdiction."); R&R at 5 n.2 ("Defendant Brinks is not challenging personal jurisdiction.").

"A court without personal jurisdiction is powerless to take further action." *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214 n.6 (11th Cir. 1999). But "[b]ecause the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982); *see also Oldfield*, 558 F.3d at 1218 n.21 ("[O]bjections to personal jurisdiction—unlike subject matter jurisdiction—are waivable."). We

---

[10] Nor must we reach the corporate-shield argument as to Arroyave. Still, we note that this doctrine "is inapplicable where" a plaintiff adequately alleges that "the corporate officer commits intentional torts." *Louis Vuitton*, 736 F.3d at 1355; *see also Doe v. Thompson*, 620 So. 2d 1004, 1006 (Fla. 1993) ("A corporate officer committing fraud or other intentional misconduct can be subject to personal jurisdiction, however."). And the AC alleges that Arroyave "personally and intentionally engaged in conduct that was calculated to inflict a direct injury upon a resident of Florida." *Villarino v. Joekel*, 2025 WL 2329959, at *6 (11th Cir. Aug. 13, 2025) (cleaned up); *see, e.g.*, AC ¶ 89 ("Arroyave was directly involved in, and knowledgeable of, Skyline's establishment of specific call centers to help target and convert ADT customers identified using ADT's misappropriated business information.").

therefore find that, in declining to challenge personal jurisdiction, Brinks has submitted to our jurisdiction. *See Posner*, 178 F.3d at 1214 n.4 (11th Cir. 1999) ("Essex did not move for dismissal on the grounds that the Florida courts lacked personal jurisdiction over it. By omitting this defense from its motion, Essex waived any challenge it could have asserted to the court's exercise of personal jurisdiction over it.").

## II.    Timeliness

The Defendants next argue that seven of the AC's ten counts are time-barred. The Magistrate Judge agreed in part, recommending that we find Counts I, II, and VIII untimely. But, as we explain below, we find that *all* the AC's counts are timely.

### a.   The Trade-Slander, Negligence, and Unjust-Enrichment Claims

No Defendant challenges the R&R's finding as to the timeliness of Counts V, IX, and X. Count V asserts a trade-slander claim against the Skyline Defendants. *See* AC ¶¶ 137–41. And Counts IX and X assert claims for negligence and unjust enrichment, respectively, against Brinks only. *See* AC ¶¶ 169–189. The Magistrate Judge recommended that we find all three claims timely because each was "based on [the] alleged continued misappropriation of ADT's proprietary business information" and so "continuing in nature." R&R at 27; *see also id.* at 26 ("[T]he continuing tort doctrine precludes . . . the statute of limitations defense.").

Skyline offers no objection to that finding as to Count V. And while it notes that "it is not clear that ADT has alleged any continuous tort (merely reciting the legal standard does not suffice)," Brinks concedes that "the Court need not resolve this issue" because "the R&R recommends dismissal of the negligence count on other grounds." Brinks Obj. at 2 n.3 (citations omitted); *see also ibid.* ("Similarly, because the R&R recommends dismissal of the trade slander and unjust enrichment claims for other reasons, the Court need not reach the limitations question as to those claims either."). So, finding no clear error in the R&R's disposition of the timeliness of those counts, we turn directly to

the remaining seven counts. *See Bradshaw v. Reliance Standard Life Ins. Co.*, 707 F. App'x 599, 604 (11th Cir. 2017) (noting that Eleventh Circuit Rule 3–1 provides that "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions").

### b. The Trade-Secret Claims

Counts I and II allege FUTSA and DTSA claims against the Skyline Defendants (as well as Ramos and Romero). *See id.* ¶¶ 96–118. Each of these claims is subject to a three-year limitations period. *See* 18 U.S.C. § 1836(d) (providing that DTSA claims "may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered"); FLA. STAT. § 688.007 (providing that a FUTSA claim "must be brought within 3 years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered"). And both § 1836(d) and § 688.007 toll the clock until the misappropriation is "discovered or by the exercise of reasonable diligence should have been discovered."

The Magistrate Judge recommended that we dismiss both counts—without prejudice—as untimely. *See* R&R at 25. Even though "ADT alleges it did not become aware of the alleged misappropriation until 2023," the R&R explained, "Exhibit 1 . . . shows that ADT received complaints in January 2019 putting ADT on notice of Defendants' alleged misconduct," but "did not plead its inability to have made an earlier discovery despite reasonable diligence." *Ibid.* Our Plaintiffs object to that finding, arguing that the R&R "seems to confuse [the fact] that reports of *deceptive sales practices* by Defendants' sales agents do[ ] not equate to notice of the *theft of alleged trade secrets*." ADT Obj. at 13. In their view, "[t]he fact that ADT received complaints of deceptive sales practices dating back to 2019 cannot be said to reasonably put ADT on notice that some defendants were improperly acquiring

27

and using ADT's trade secrets to commit those deceptions," and so "the DTSA and FUTSA claims were asserted by ADT within three years of the time that it reasonably learned its trade secrets may have been misappropriated in 2023." *Id.* at 13–14. The Defendants counter that this theory is "belied by the entry at line 49" of Exhibit 1, "where the allegation is *not* deceptive sales practices, but rather that Skyline has 'access to ADT customer list/info.'" Def. Opp. at 12. So, as the Defendants see it, "ADT *should* have discovered that its customer lists had been compromised in 2019, when customers complained about access to their information." *Ibid.*

Here's the problem with the Defendants' theory. Exhibit 1 collates Skyline-specific complaints, organizing the material by date and by content. But this sorting represents ADT employees' "determination of whether, and what type of the deceptive sales conduct occurred." Gold Aff. at 7. Indeed, ADT operators "input the date of the respective incident" and, after "identif[ying] missing or vague information as to what appears to be a deceptive sales practice," "will often investigate the incident further," "call the customer to discuss the subject events," and *then* "update the form to reflect the date of the call and a summary of the discussion." *Id.* at 3, 4. So, while Exhibit 1 notes that misappropriation occurred in 2019, it doesn't purport to establish that the Plaintiffs became aware of the issue in 2019. It *might* be true, in other words, that the Plaintiffs had enough information in 2019 to piece together the theft of trade secrets. But the Plaintiffs allege otherwise, and the law is well-settled that we must resolve all reasonable inference in the Plaintiffs' favor at this early stage of the litigation.

"In deciding a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in a complaint as true and take them in the light most favorable to [the] plaintiff." *Dusek*, 832 F.3d at 1246. And crediting the Plaintiffs' allegations that they didn't become aware of any trade-secret theft until 2023, *see* AC ¶ 43 ("Shortly after ADT became aware of this conduct, on October 11, 2023, ADT terminated Ramos for stealing ADT's proprietary business information[.]"), we cannot say that "it is

apparent from the face of the complaint that the claim is time-barred," *Beach Cmty. Bank v. CBG Real Est. LLC*, 674 F. App'x 932, 934 (11th Cir. 2017). So, "[a]ccepting as true the allegations in the complaint, we cannot conclude as a matter of law" that ADT "should have discovered" the alleged theft *more* than three years before the filing of the complaint. *Beach Cmty. Bank*, 674 F. App'x at 935. We therefore **SUSTAIN** the Plaintiffs' objections as to the timeliness of Counts I and II.

### c. Civil Conspiracy

Count VIII alleges a civil-conspiracy claim against the Skyline Defendants (as well as Ramos and Romero). *See id.* ¶¶ 162–68. "[A]ctions for conspiracy in Florida are governed by the four year statute of limitations." *Newberger v. U.S. Marshals Serv.*, 751 F.2d 1162, 1166 (11th Cir. 1985) (quotation marks omitted); *see also Coursen v. Shapiro & Fishman, GP*, 588 F. App'x 882, 886 n.3 (11th Cir. 2014) ("[T]he statute of limitations for civil conspiracy is four years, pursuant to Fla. Stat. § 95.11(3)(*o*)."); FLA. STAT. § 95.11(3)(*o*) (providing that "[a]ny action not specifically provided for in these statutes" must be brought "[w]ithin four years" (cleaned up)). The Magistrate Judge viewed this claim as time-barred because, "[l]ike ADT's DTSA and FUTSA claims, ADT's civil conspiracy claim is based on Defendants' alleged theft of trade secrets," and this theft "is not a tort that is continuing in nature." R&R at 26. The R&R thus concluded that, since "Exhibit 1 . . . shows that ADT received complaints in January 2019," the "civil conspiracy claim began to accrue in 2019" and the "statute of limitations for this claim expired in 2023." *Ibid.*

Our Plaintiffs argue that this finding "suffers from the same flawed reasoning as the recommendation on the DTSA and FUTSA claims"—*i.e.*, it "fails to distinguish between general complaints of deceptive sales practices" and "ADT's knowledge that the defendants were improperly using ADT's trade secrets to commit those deceptive practices." ADT Obj. at 15. They further contend that the R&R "fails to acknowledge the sheer number of deceptive sales practices at issue, and that each incident is an actionable tort subject to a new limitations period." *Id.* at 14. And they

add that the R&R "defies logic" because "Ramos did not even work at ADT in 2019," so it "makes no sense that Ramos would have been misappropriating ADT's trade secrets and selling them to the other defendants in 2019 so as to trigger the statute of limitation for civil conspiracy at that time." *Id.* at 15–16.

The Skyline Defendants respond that the R&R "properly found that ADT's civil conspiracy claim is time barred." Skyline Opp. at 13. They point to the Plaintiffs' "concession" at "oral argument" that "the civil conspiracy relates to the theft of the trade secret only, not to the deceptive sales practice," which they say "foreclose[s]" the argument that the R&R overlooked the "continuing nature of the deceptive sales practices." *Ibid.* (quotation marks omitted). And they deny any "logical fallacy" in the R&R's timeline, noting that the AC alleges that the conspiracy was in motion "since at least 2018," that Ramos worked at ADT from 2014 to 2017, and that Ramos allegedly had a "mole" inside the company during his absence. *Id.* at 13–14.

Our analysis as to Counts I and II applies with equal force here. The Defendants assert that the Plaintiffs first became aware of the conspiracy in 2019, but the Plaintiffs allege that they didn't know about the tort until 2023. "[A]t the motion-to-dismiss stage, a complaint may be dismissed on the basis of a statute-of-limitations defense only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute." *Lindley v. City of Birmingham*, 515 F. App'x 813, 815 (11th Cir. 2013) (cleaned up). And, as we explained above, the Gold Affidavit casts *some* doubt on the Defendants' theory. So, faced with competing evidence, we must draw all reasonable inferences in favor of the Plaintiffs. And since the Plaintiffs credibly allege that Count VIII didn't begin to accrue until 2023, we **SUSTAIN** the Plaintiffs' objection as to the timeliness of Count VIII.

### d.  The Lanham Act, Tortious-Interference, and Unfair-Competition Claims

Finally, we consider the timeliness of four counts—alleging Lanham Act (Counts III and IV), tortious-interference (Count VI), and unfair-competition (Count VII) claims—against Brinks and the

Skyline Defendants. *See* AC ¶¶ 119–36, 142–49, 162–68. The Magistrate Judge found those counts timely. As to the Lanham Act claims, the R&R noted that "the Lanham Act does not specify a statute of limitations." R&R at 27. As to the other claims, the R&R found them "continuing in nature because they are based on [the] Defendants' alleged continued misappropriation of ADT's proprietary business information"—and therefore, the R&R added, "the continuing tort doctrine precludes [the] Defendants' statute of limitations defense." *Ibid.*

Brinks counters with two objections.[11] *First*, Brinks says that "the R&R incorrectly concludes that claims under the Lanham Act have no statute of limitations." Brinks Obj. at 3. "Though the text of the Lanham Act itself does not prescribe a statute of limitations," Brinks contends, "the Eleventh Circuit has made clear that the four-year limitations period governing most analogous state law claims also applies to Lanham Act claims." *Ibid. Second*, Brinks argues that the R&R "erroneously states that ADT's tortious interference and common law unfair competition claims are 'continuing in nature'" because "ADT does not allege that Brinks . . . *ever* misappropriated ADT's proprietary information." *Id.* at 3–4; *see also id.* at 4 ("Brinks . . . is not named as a defendant on the trade secret claims in this case . . . . As such, ADT's claims against Brinks . . . cannot possibly be 'continuing' based on such conduct.").

Our Plaintiffs offer two responses. As to the Lanham Act claims, they say that "ADT does not dispute Brinks' contention that the statute of limitations for Lanham Act claims in this district is four years in light of the statute of limitations for analogous Florida law claims." ADT Opp. I at 2.[12]

---

[11] The Skyline Defendants focus their objections *exclusively* on personal jurisdiction. So, as we noted above, they've forfeited for now the chance to object to the R&R's findings *both* on the timeliness *and* on the merits of the ten counts.

[12] Nor do we. *See Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*, 7 F.4th 989, 1005 (11th Cir. 2021) ("[B]ecause the Lanham Act does not contain a statute of limitations, we consider the limitations period for analogous state law claims as the touchstone for laches. The analogous Florida limitations period for this type of action is four years." (cleaned up)); *see also Martin v. E.C. Publications, Inc.*, 849 F. App'x 239, 241 (11th Cir. 2021) ("Because Florida law provides no

Instead, the Plaintiffs argue that the AC "states timely claims against Brinks based on a pattern of deceptive conduct spanning from 2020 until the February 27, 2024 filing of the Complaint" and that "Exhibit 2 contains several hundred instances of Brinks' misconduct within the four year statute of limitations period." *Ibid.* In other words, "[t]he instances of Brinks' misconduct prior to 2020 simply provide evidence that Brinks was on notice that its sales representatives were engaged in a pattern of deceptive conduct, which is relevant for proving punitive damages." *Ibid.*

As to the tortious-interference and unfair-competition claims, our Plaintiffs insist that "this Court does not need to find that Brinks' conduct was a continuing act, as opposed to hundreds of individual acts, for ADT to state a claim because there are several hundred instances within the four year limitations period of Brinks engaging in . . . tortious interference with a contract and common law unfair competition." *Id.* at 2–3; *see also id.* at 3 n.3 ("ADT does not contend, based on the facts available to it at this time, that Brinks misappropriated its proprietary information. But that has absolutely no bearing on whether ADT's tortious interference with a contract and common law unfair competition claims are timely, as those claims are supported by the several hundred instances of deceptive practices outlined in Exhibit 2.").

We agree with the Plaintiffs. In bringing the Lanham Act claims, the AC describes *ongoing* violations. It alleges, for instance, that the Defendants "confuse ADT's customers as to the affiliations of . . . Skyline and Brinks . . . with ADT," that sales agents from both Skyline and Brinks "use false representations of affiliation with ADT . . . with the intent of deceiving ADT's customers as to a relationship or affiliation with ADT that does not exist," and that "ADT has been and will continue to be damaged as a result." AC ¶¶ 120, 121, 124, 127. Moreover, the AC incorporates both Exhibits.

---

specific limitations period for Plaintiff's trademark, unfair competition, or misappropriation claims, the catch-all four-year limitations period in Fla. Stat. § 95.11(3)[ ] applies."); Fla. Stat. § 95.11(3) (imposing a four-year limitations period on "[a]ny action not specifically provided for in these statutes").

*See id.* ¶ 125 ("In fact, as documented in the accompanying Exhibit 1 (as to Skyline) and Exhibit 2 (as to Brinks), they already have created confusion among customers and will continue to do so if permitted to continue."). So, any Brinks-specific allegations between June 17, 2020, and June 17, 2024 (*i.e.*, the date on which the Plaintiffs filed the AC) fall within the four-year statute of limitations, and there's no need for a continuing-violation analysis.[13] And, as the Plaintiffs appear to concede, any Brinks-specific claims arising *before* that period—to the extent they exist—fall *outside* the statute of limitations. *See* ADT Opp. I at 2 ("ADT's Lanham Act claims, based on a four-year long pattern of deceptive conduct from 2020-2024, are not barred by the statute of limitations.").

This analysis applies with equal force to the tortious-interference and unfair-competition claims—both of which likewise have four-year limitations periods. *See King v. Bencie*, 806 F. App'x 873, 876 (11th Cir. 2020) (noting that, under Florida law, "a four-year limitations period applies to claims of tortious interference with contractual rights and advantageous business relationships"); *Martin v. E.C. Publications, Inc.*, 849 F. App'x 239, 241 (11th Cir. 2021) ("Because Florida law provides no specific limitations period for . . . unfair competition . . . claims, the catch-all four-year limitations period . . . applies."). We therefore **OVERRULE** Brinks's objections as to Counts III, IV, VI, and VII, except as to any claims predating June 17, 2020.

---

[13] The Plaintiffs filed their original Complaint on February 27, 2024, but that Complaint didn't assert any claims against Brinks. *See generally* Complaint. Because Brinks wasn't named in the original Complaint, we can't say that the AC's claims against Brinks relate back to the claims in that original Complaint—which means we can't say that February 27, 2020 (instead of June 17, 2020) is the cut-off for any Brinks-specific claims. *See* FED. R. CIV. P. 15(c)(1) ("An amendment of a pleading relates back to the date of the original pleading when relation back is permitted by the law that provides the statute of limitations applicable to the action."). And nothing in the record leads us to suspect that excluding Brinks from the original Complaint marked anything but "a deliberate choice to sue one party instead of another." *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 549 (2010); *see also id.* at 548–49 ("The question under Rule 15(c)(1)(C)(ii) is . . . whether [the defendant] knew or should have known that it would have been named as a defendant but for an error.").

### III.      The Merits

Having considered the timeliness of the AC, we turn now to its merits. As we explain below, we find that all the counts—except for IX and X—survive the MTD.

#### a.    The Lanham Act, Tortious-Interference, and Unfair-Competition Claims

The Magistrate Judge believed that the Plaintiffs had stated viable Lanham Act (Counts III and IV), tortious-interference (Count VI) and unfair-competition (Count VII) claims against the Defendants. *See* AC ¶¶ 119–36, 142–49, 162–68. In a global objection to that recommendation, Brinks argues that the R&R erred by allowing the Plaintiffs "to proceed based on generalized allegations" that "sound in fraud." Brinks Obj. at 5. Because Counts III, IV, VI, and VII "repeatedly use words like 'scheme,' 'fraud,' 'false,' and 'deception,'" Brinks contends, Rule 9(b)'s heightened pleading standard applies. *Ibid.* And, under that standard, Brinks says, those counts are "not sufficient" because they "merely (i) assert that a series of unidentified individuals were speaking on behalf of Brinks Home (thus, assuming the conclusion ADT sets out to prove) and (ii) provide garbled second- and third-hand summaries of what someone allegedly said to these customers." *Ibid.*

The Plaintiffs maintain that "ADT has adequately pled its Lanham Act, tortious interference, and common law unfair competition claims." ADT Opp. I at 4. "As a preliminary matter," they insist, "the Objections fail to cite to a single case applying the 9(b) pleading standard to Lanham Act, tortious interference with a contract, or common law unfair competition claims." *Ibid.* And, even if that pleading standard applied, our Plaintiffs continue, "Exhibit 2 . . . goes into painstaking detail regarding Brinks' misconduct including the date of the deceptive conduct; the deceptive statement made; which of the entity defendants the sales representative was working on behalf of; and in many cases, the first and last name of the specific Brinks sales representative that made the statement." *Id.* at 4–5; *see also id.* at 5 ("Even for the instances of deceptive conduct where ADT has not been able to identify the

first and last name of the Brinks sales representative, ADT has identified every other detail of the interaction, including date, exact location, and content of the deceptive statement.").

Our analysis here proceeds in two parts. *First*, we address Brinks's contention that Counts III, IV, VI, and VIII fail to survive Rule 9(b)'s heightened pleading standard. *Second*, we address the merits of those counts.

### i.  The Pleading Standard

We can assume without deciding that Rule 9(b)'s pleading standard applies to these four claims. *See, e.g.*, *ZAGG Inc. v. Ichilevici*, 2024 WL 5186468, at *4–5 (S.D. Fla. Dec. 20, 2024) (Altman, J.) (noting that the Eleventh Circuit "has not yet weighed in" on whether Rule 9(b) applies to Lanham Act claims); *Medimport S.R.L. v. Cabreja*, 929 F. Supp. 2d 1302, 1319 n.10 (S.D. Fla. 2013) (Moreno, C.J.) ("Although Rule 9(b) does not apply to a tortious interference claim, it does apply to fraud allegations underlying such a claim."); *Third Party Verification, Inc. v. Signaturelink, Inc.*, 492 F. Supp. 2d 1314, 1327 (M.D. Fla. 2007) (Conway, J.) ("[The Defendant] also argues that [the] unfair competition claim does not rise to the level of particularity required by Rule 9. However, [the Defendant] fails to cite any law whatsoever that such claims must meet Rule 9's standards."); *see also U.S. ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1314 n.25 (11th Cir. 2002) (explaining that an "exception" to Rule 9(b)'s standard "may apply in appropriate circumstances to aid those alleging prolonged multi-act schemes"); *Burgess v. Religious Tech. Ctr., Inc.*, 600 F. App'x 657, 662 (11th Cir. 2015) ("Allegations of date, time or place satisfy the Rule 9(b) requirement that the circumstances of the alleged fraud must be pleaded with particularity, but alternative means are also available to satisfy the rule." (quotation marks omitted)). And we can make that assumption because Counts III, IV, VI, and VII overcome Rule 9(b)'s higher bar.

Rule 9(b) provides that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b). "Rule 9(b) is satisfied if the

complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quotation marks omitted). "Notably, Rule 9(b) does not require a plaintiff to allege specific facts related to the defendant's state of mind when the allegedly fraudulent statements were made." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). "Instead, as Rule 9(b) itself states, malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Ibid.* (cleaned up). In short, a complaint satisfies Rule 9(b) "if it pleads the who, what, when, where, and how of the allegedly false statements and then alleges generally that those statements were made with the requisite intent." *Rife v. Newell Brands, Inc.*, 632 F. Supp. 3d 1276, 1311 (S.D. Fla. 2022) (Altman, J.) (cleaned up).

The Plaintiffs' Lanham Act, tortious-interference, and unfair-competition allegations meet that standard. The AC alleges that the Defendants and their agents "use false representations of affiliation with ADT to confuse ADT's customers as to the agents' true affiliation, to interest the customers in their pitches, to win the customers' trust, and to gain access to their homes." AC ¶ 121; *see also id.* ¶ 130 (alleging that "[t]hese material misrepresentations and omissions . . . wrongly cause customers to switch their services from ADT to Skyline/Brinks"). And the Exhibits identify specific sales agents, specific misrepresentations, specific dates, and specific incidents. *See, e.g.*, Ex. 1 at 52 (alleging that "a brinks agent named Lee Cordova . . . [is] going door to door telling people that brinks purchased ADT and was taking over our accounts in the area"); *id.* at 14 ("[A] man came by named[ ] Alfonso Mendez and said he was with ADT and she needed an upgrade on her box[.]"); Ex. 2 at 5 ("[A] technician named Shane Herrod went to her home and told her that Brinks bought out ADT[.]");

36

*id.* at 49 ("[A] man named Christopher Alvarez represented himself as an ADT employee and stated her system was outdated and needed to be replaced."). The AC further alleges that "Skyline and Brinks' conduct is knowing and intentional." AC ¶ 82; *see also ibid.* ("At worst, Skyline and Brinks knowingly teach and condone these actions by their sales agents. At best, Skyline and Brinks' management are aware of such conduct but do not take sufficient actions to stop it[.]"). And the AC claims that these misrepresentations enabled "both Skyline and Brinks" to reap "millions of dollars of ill-gotten profits." AC ¶ 36. We thus conclude that the AC sufficiently alerts the Defendants "to the precise misconduct with which they are charged" and, therefore, satisfies Rule 9(b)'s heightened pleading standard. *Ziemba*, 256 F.3d at 1202 (quotation marks omitted).

### ii.  Stating Claims for Relief

Having confirmed that the allegations pass muster *even* under Rule 9(b), we now consider whether these four counts state viable claims for relief. We conclude that they do and **OVERRULE** Brinks's objections.[14]

### 1.  Affiliation Misrepresentation

Count III brings an affiliation-misrepresentation claim under the Lanham Act, 18 U.S.C. § 1125(a)(1)(A), against the Defendants. *See* AC ¶¶ 119–28. According to the Plaintiffs, "ADT and its marks are injured" by the Defendants' "use of false representations of affiliation with ADT to confuse ADT's customers as to the agents' true affiliation." *Id.* ¶¶ 119–20. The Magistrate Judge determined that "ADT has sufficiently stated a claim under 15 U.S.C. § 1125(a)(1)(A)" by alleging that "it

---

[14] Brinks objects to the R&R on only two grounds—that certain counts are untimely and that "the R&R does not hold one way or the other whether Rule 9(b) applies in this case and does not appear to apply Rule 9(b)'s stringent pleading standard." Brinks Obj. at 4. But Brinks offers no argument as to the specifics of the Lanham Act, tortious-interference, and unfair-competition claims. And, despite being named in those counts, the Skyline Defendants—as emphasized above—limit their objections to the personal-jurisdiction issue. We therefore examine Counts III, IV, VI, and VIII without merits-based objections from the Defendants.

owns . . . and has used the tradename ADT over a hundred years," that the "Defendants used false representations of affiliation with ADT to confuse ADT's customers," and that "[t]he false and misleading statements are likely to confuse consumers." R&R at 28. We agree.

The Lanham Act provides that "[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . *is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person* . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 18 U.S.C. § 1125(a)(1)(A) (emphasis added). Section 1125(a)(1)(A) "protects trademark owners from infringement and unfair competition." *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1344 (11th Cir. 2012).

"[T]o demonstrate infringement, a party must show (1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *Id.* at 1348 (quotation marks omitted). "In determining whether a likelihood of confusion exists, the fact finder evaluates a number of elements including: the strength of the trade dress, the similarity of design, the similarity of the product, the similarity of retail outlets and purchasers, the similarity of advertising media used, the defendant's intent, and actual confusion." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1538 (11th Cir. 1986). But, "of these seven factors, we consider the type of mark and the evidence of actual confusion to be the two most important factors." *Suntree Techs.*, 693 F.3d at 1346 (cleaned up).

In moving to dismiss Count III, the Defendants argue that the "Plaintiffs fail to state a false affiliation claim because they fail to adequately plead actual confusion by consumers, which is the best

evidence of likelihood of confusion." MTD at 24 (quotation marks omitted). Not so. The AC alleges that "Skyline's sales agents" and "Brinks' sales agents" "already have created confusion among consumers and will continue to do so if permitted to continue." AC ¶¶ 120, 121, 125. This confusion, the AC alleges, results in "many" ADT customers "signing contracts with Skyline in the mistaken belief that they are contracting with ADT or one of its affiliates." *Id.* ¶ 126; *see also id.* ¶ 127 ("ADT has been and will continue to be damaged . . . by the disruption of ADT's relationships with its customers, by the diversion of ADT's customers to the Skyline Defendants, by ADT's lost royalties, by ADT's loss of control of the use of its brand in the market, and by damage to ADT's goodwill and reputation as a reliable provider of security systems."). And, for good measure, the Exhibits identify *hundreds* of examples of customer confusion. *See, e.g.*, Ex. 1 at 17 ("I'm very confused by all of this. Brinks man said no that ADT was not going out of business. Now I don't even have an alarm system as Brinks lady unhooked it all."); Ex. 2 at 10 ("Customer stated that she was confused because if they bought out ADT why is ADT calling her. They told her that Brinks bought out ADT 3 years ago and they told her it's the same company they were just upgrading."). These allegations plainly suffice to state an affiliation-misrepresentation claim at this stage of the case.[15]

---

[15] We read Count III—styled as an *affiliation-misrepresentation* claim—as asserting a false-designation-of-origin claim. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1248 (11th Cir. 2007) ("[S]ection 43(a)'s language—which prohibits a 'false designation of origin'—has been construed by the courts as creating a federal action for 'passing off,' which occurs 'when a producer misrepresents his own goods or services as someone else's.'"); *see also Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 n.1 (2003)("Passing off (or palming off, as it is sometimes called) occurs when a producer misrepresents his own goods or services as someone else's. 'Reverse passing off,' as its name implies, is the opposite: The producer misrepresents someone else's goods or services as his own." (citations omitted)). To the extent the Plaintiffs are trying to assert a *trademark-infringement* claim instead, our analysis would remain unchanged. *See Suntree Techs.*, 693 F.3d at 1346 ("In order to prevail on federal claim of trademark infringement and unfair competition, a trademark owner must show (1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." (quotation marks omitted)).

## 2.  False Advertising

Count IV advances a false-advertising claim under the Lanham Act, 18 U.S.C. § 1125(a)(1)(B), against the Defendants. *See* AC ¶¶ 129–36. The Magistrate Judge found that the allegations of "widespread use of improper sales tactics to thousands of customers through door-to-door sales"—combined with the "detail[s]" listed in Exhibit 2 and the allegations concerning the "false and misleading speech made by . . . competitors . . . for the purpose of converting customers"—"state a claim for violation of the Lanham Act 15 U.S.C. § 1125(a)(1)(B)," at least "[a]t this stage." *Id.* at 29–30. Again, we agree.

Under the Lanham Act, "[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . *in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities* . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 18 U.S.C. § 1125(a)(1)(B) (emphasis added). "A defendant is liable for false advertising under the Lanham Act if (1) the defendant's statements were false or misleading; (2) the statements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on the consumers' purchasing decision; (4) the misrepresented service affects interstate commerce; and (5) the plaintiff has been, or likely will be, injured as a result of the false or misleading statement." *Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1196 (11th Cir. 2018) (quotation marks omitted). Our Plaintiffs satisfy those elements.

*First*, they allege that the Defendants made false or misleading statements. "A statement is 'false or misleading' if it is literally false as a factual matter or if it is literally true or ambiguous but implicitly conveys a false impression, is misleading in context, or is likely to deceive customers."

*ZAGG*, 2024 WL 5186468, at *6 (cleaned up). And, as we discussed above, the AC alleges that "Skyline and Brinks sales representatives have misled scores of ADT customers into believing, among other things: (1) that the Skyline/Brinks agent was simply 'updating' or 'upgrading' the ADT customer's equipment, when in reality the Skyline/Brinks agent was switching out the ADT system for a Skyline/Brinks system; (2) that ADT has been bought out or is going out of business and that Skyline/Brinks is taking over ADT accounts; and (3) that Skyline/Brinks is a subcontractor, installer, or is otherwise affiliated with or acting on behalf of ADT." AC ¶ 55.

    *Second*, the Plaintiffs allege that these statements deceived ADT consumers—and that the deception was material. Because "not all deceptions affect consumer decisions," a "plaintiff must establish that the defendant's deception is likely to influence the purchasing decision." *ZAGG*, 2024 WL 5186468, at *6 (quotation marks omitted). "A plaintiff may establish this materiality requirement by proving that the defendants misrepresented an inherent quality or characteristic of the product." *Ibid.* (quotation marks omitted). Here, the AC alleges that "Skyline's and Brinks' sales agents . . . use deceptive sales pitches that are intended to mislead (and that do mislead) ADT's customers into believing they represent ADT, that Skyline/Brinks is affiliated with ADT, that they are visiting at ADT's direction, that they work for the companies that made the ADT alarm equipment installed in the customers' homes, or that ADT has otherwise blessed the Skyline/Brinks agents to work on ADT's behalf." AC ¶ 57; *see also id.* ¶ 58. ("[T]hese communications falsely suggest to the customer that there is a connection or affiliation between the source of the contact reaching out to the customer (Skyline/Brinks) and ADT."). And the AC claims that this deception "lead[s] the customers to sign Skyline/Brinks contracts and install Skyline/Brinks alarm systems in the often mistaken belief that they are receiving new ADT equipment from ADT, an ADT affiliate, or an ADT successor; that Skyline/Brinks is assuming the customer's ADT account; or that the customer has no choice but to

permit the transaction to go forward if he or she wishes to continue to have operational alarm-monitoring services." *Id.* ¶ 61.

*Finally*, the Plaintiffs explain *how* they've been injured. Specifically, they claim that they've lost sales because customers—duped by these "false and misleading pitches," *ibid.*—transfer their services to Skyline and Brinks, *see id.* ¶ 135 ("ADT has been and will continue to be damaged as a result of the Skyline Defendants' and Brinks' false advertising vis-a-vis the confusion of the market for ADT's goods and services, by the disruption of ADT's relationships with its customers, by the diversion of ADT's customers to Skyline/Brinks, by ADT's lost royalties, by ADT's loss of control of the use of its brand in the market, and by damage to ADT's goodwill and reputation as a reliable provider of security systems."). "And it's well-settled that lost sales are a sufficient form of injury under the Lanham Act." *ZAGG*, 2024 WL 5186468, at *7. At the motion-to-dismiss stage, then, the Plaintiffs adequately allege Count IV.

### 3. Unfair Competition

Count VII asserts an unfair-competition claim against the Defendants. *See* AC ¶¶ 150–61. According to the AC, the Defendants have engaged "in a conspiracy to steal, purchase, and sell ADT's proprietary business information through improper and deceptive means." *Id.* ¶ 151; *see also id.* ¶ 152 (alleging that sales agents "prey on unsuspecting and sometimes elderly and infirm customers and target them with deceptive sales practices," "make false sales pitches to ADT's customers that are designed to mislead them into believing that they are acting on ADT's behalf," and "make other material misrepresentations about ADT including but not limited to (1) that the Skyline agent was simply 'updating' or 'upgrading' the ADT customer's equipment, when in reality the Skyline agent was switching out the ADT system"). The Magistrate Judge found that this claim "rises or falls with [the] federal trademark infringement claim"—*i.e.*, Count III—and thus "likewise survives." R&R at 33 (quotation marks omitted). So do we.

"To prevail on a Florida common law unfair competition claim, a plaintiff must prove that: (1) the plaintiff is the prior user of the mark; (2) the mark is arbitrary, suggestive, or has secondary meaning; (3) the defendant is using a confusingly similar mark to indicate similar goods marketed in competition with the plaintiff in the same trade area in which the plaintiff has already established its mark; and (4) because of the defendant's action, consumer confusion regarding the defendant's goods is likely." *Hong Kong E-Com. Co. v. Individuals, Corps., Ltd. Liab. Companies, Partnerships & Unincorporated Associations Identified in Schedule "A" Hereto*, 2025 WL 2270033, at *3 (S.D. Fla. June 5, 2025) (Altman, J.). Accordingly, "[t]he legal standard for unfair competition, which includes palming off and false designation of origin, and trademark infringement under both the Lanham Act and common law has been held to be essentially the same," as they each require establishing that "the defendant's use of the mark in commerce creates a likelihood of confusion among consumers as to the origin of the goods." *Shenzhen Kinwong Elec. Co. v. Kukreja*, 778 F. Supp. 3d 1255, 1295 (S.D. Fla. 2025), *amended in part*, 2025 WL 2337095 (S.D. Fla. Aug. 13, 2025) (Altman, J.); *see also Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1475 n.3 (11th Cir. 1991) ("[T]he same facts support a cause of action for unfair competition as for trademark infringement; if there is no genuine issue of fact as to trademark infringement, there is none as to unfair competition, either.").

Since "[t]here is no essential difference between trade-mark infringement and what is loosely called unfair competition," we needn't recycle our analysis of Count III. *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1276 (11th Cir. 2015) (Marcus, J.); *see also ibid.* ("Unfair competition is the genus of which trade-mark infringement is one of the species[.]"). So, for the reasons we outlined above, we find that Count VII states a viable unfair-competition claim. *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 981 (11th Cir. 1983) ("As a general rule[,] the same facts which would support an action for trademark infringement would also support an action for unfair competition." (cleaned up)); *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 n.4

(11th Cir. 2001) ("Courts may use an analysis of federal infringement claims as a 'measuring stick' in evaluating the merits of state law claims of unfair competition."); *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 652–53 (11th Cir. 2007) ("[T]he analysis of the Florida statutory and common law claims of trademark infringement and unfair competition is the same as under the federal trademark infringement claim." (quotation marks omitted)).

### 4.  Tortious Interference

Finally, Count VI brings a tortious-interference claim against the Defendants. *See* AC ¶¶ 142–49. The Plaintiffs allege that, "[d]espite [having] knowledge of the customer's contractual and business relationship with ADT, the Skyline Defendants' and Brinks' sales representatives intentionally and without valid justification interfere with such relationship using improper means." *Id.* ¶ 146. The Magistrate Judge found that "ADT has sufficiently alleged each element of tortious interference with [an] advantageous business relationship." R&R at 32. We see no error in that finding.

"The elements of tortious interference with a contract or business relationship are: (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the interference." *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 385 (Fla. Dist. Ct. App. 1999). "For the interference to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship." *Al Rushaid Petroleum Inv. Co. v. Siemens Energy Inc.*, 159 F.4th 887, 894 (11th Cir. 2025) (Marcus, J.). "The unchallengable controlling principle is that so long as improper means are not employed, activities taken to safeguard or promote one's own financial interests are entirely non-actionable." *Sec. Title Guarantee Corp. of Baltimore v. McDill Columbus Corp.*, 543 So. 2d 852, 855 (Fla. Dist. Ct. App. 1989) (cleaned up).

The Plaintiffs adequately allege all these elements. *First*, the AC claims that "ADT maintains valid and enforceable contracts and business relationships with its customers" and that "[t]he Skyline Defendants and Brinks are knowledgeable of the contractual and business relationships between ADT and its customers." AC ¶¶ 142, 144; *see also id.* ¶ 145 ("When Skyline's sales agents (who are directed by Defendant Arroyave and trained and led by Defendants Haynes, Nuñez Hernandez, and VanSlyke) and Brinks' sales agents visit the homes of these individuals, they become (or are already) aware of such relationship and contract by, among other means: the sign displayed in front of the customer's home, talking with the customer, observing the ADT equipment in the customer's home, or through prior research and intelligence conducted on the customer's address regarding existing alarm systems."). *Second*, the AC asserts that, "[d]espite knowledge of the customer's contractual and business relationship with ADT, the Skyline Defendants' and Brinks' sales representatives intentionally and without valid justification interfere with such relationship using improper means." *Id.* ¶ 146; *see also ibid.* (alleging that the Defendants "mislead[ ] ADT's customers into believing that Skyline or Brinks represents ADT," "induce ADT customers to believe that they have an existing business relationship with ADT," "lead customers to sign Skyline or Brinks contracts and install Skyline or Brinks alarm systems," and "procure the breach of the ADT contract upon the false promise that Skyline or Brinks will 'buy out' the remaining term of their ADT contract"). *Finally*, the AC alleges that the "intentional and unjustifiable interference with ADT's business relationships have caused ADT to suffer irreparable harm and damages in the form of lost goodwill and lost profits." *Id.* ¶ 148; *see also ibid.* ("ADT is damaged by the Skyline Defendants and Brinks' unlawful conduct by losing revenue streams that otherwise would remain with ADT absent the Skyline Defendants and Brinks' 'buy out' offer.").

Parrying, the Defendants offer two arguments—both unpersuasive. *One*, they say that the Plaintiffs "fail to adequately allege an 'unjustified interference'" because "what [the] Plaintiffs challenge is legitimate competition for potential customers between two direct competitors." MTD at

27 (quotation marks omitted). *Two*, they claim that the "alleged damages are wholly speculative" because the "mere hope that existing and future customers would continue to buy [ADT's] products is nothing more than pure speculation." *Id.* at 28 (quotation marks omitted). We disagree.

The AC claims that the Defendants engaged in "improper means," such as "misleading ADT customers into believing that" ADT "blessed the Skyline Defendants and Brinks to work on ADT's behalf." AC ¶ 146. That conduct bears little resemblance to "legitimate competition." *See Al Rushaid Petroleum Inv. Co.*, 159 F.4th at 896 ("'Improper means' include the use of . . . conspiratorial conduct, as well as . . . misrepresentations to customers or suppliers, illegal conduct or threats of illegal conduct." (cleaned up)). In any event, the Plaintiffs don't need to show "improper means," since the Defendants aren't parties to ADT's contracts. *See id.* at 895–96 ("Generally, if a defendant is not a stranger to the business relationship, then its interference cannot satisfy the third element of a prima facie case for tortious interference. However, a non-stranger's conduct still may be actionable in a tortious interference claim in two situations: (1) if improper means are employed, or (2) if the motive for the actions is purely malicious and not coupled with any legitimate competitive economic interest." (cleaned up)). And, as to damages, the AC offers more than mere "speculation" and instead alleges that the Plaintiffs suffer "lost good will and lost profits." AC ¶ 149. Count VI thus adequately alleges a claim for relief.

### b. Trade Slander

Count V advances a trade-slander claim against the Defendants. *See* AC ¶¶ 137–41. According to the Plaintiffs, "Skyline and Brinks, through their sales agents, and Defendants Arroyave, Haynes, Nuñez Hernandez, and VanSlyke individually, have intentionally made false and misleading statements about ADT" that "demean the quality of ADT's goods and services" and which "Defendants Skyline, Brinks, Arroyave, Haynes, Nuñez Hernandez, and VanSlyke knew . . . to be false." *Id.* ¶¶ 137–39. The Magistrate Judge determined that the Plaintiffs "provide[d] sufficient details" to make out a "specific

defamatory statement," but ultimately found that "ADT fails to plead special damages." R&R at 31. In her view, "[g]eneral allegations that ADT suffered damage to loss profits, customers, goodwill, and damage to its reputation does not meet the special damages requirement." *Ibid.*

The Plaintiffs object to this recommendation, arguing that the R&R "overlooks" the fact that the AC and Exhibits "identify over 1,100 customers that cancelled their ADT accounts as a result of the defendant's deceptive sales practices." ADT Obj. at 16; *see also ibid.* ("ADT's complaint and supporting exhibits here go well beyond showing a single lost client; they aver that ADT has lost at least hundreds of customers as a result of Defendants' practices."). The Defendants in turn maintain that the Exhibits "do not contain any facts showing a diminution in business resulting from ADT customers' supposed cancellations." Def. Opp. at 15; *see also ibid.* ("Indeed, ADT does not (and, in many cases, cannot) allege that any of its customers cancelled their ADT services or that ADT suffered any identifiable harm from the acts about which it complains.").

"Slander of title, or as it is sometimes called, disparagement of property, arises out of an injurious falsehood, such as malicious publication of false statements concerning title to one's property." *Procacci v. Zacco*, 402 So. 2d 425, 426 (Fla. Dist. Ct. App. 1981); *see also Old Plantation Corp. v. Maule Indus., Inc.*, 68 So. 2d 180, 181 (Fla. 1953) ("[T]he term 'slander of title' has by use become a recognized phrase of the law; and an action therefor is permitted against one who falsely and maliciously disparages the title of another to property, whether real or personal, and thereby causes him some special pecuniary loss or damage." (quotation marks omitted)). "In a disparagement action the plaintiff must allege and prove the following elements: (1) A falsehood (2) has been published, or communicated to a third person (3) when the defendant-publisher knows or reasonably should know that it will likely result in inducing others not to deal with the plaintiff and (4) in fact, the falsehood does play a material and substantial part in inducing others not to deal with the plaintiff; and (5) special

damages are proximately caused as a result of the published falsehood." *Bothmann v. Harrington*, 458 So. 2d 1163, 1168 (Fla. Dist. Ct. App. 1984).

The Plaintiffs adequately plead those elements. They allege that the Defendants "intentionally made false and misleading statements . . . that ADT is going out of business, that ADT has been bought out by Skyline/Brinks, and that Skyline/Brinks are taking over all ADT accounts." AC ¶ 137. They claim that the Defendants "knew the statements to be false" and that the statements "are defamatory *per se* in that the statements suggest conduct incompatible with the lawful exercise of business." *Id.* ¶¶ 139–40. And they allege that "[t]he statements are injurious and damage ADT in its industry and marketplace by causing ADT to lose sales, profits, and good will; suffer injury to its reputation with consumers; and incur attorney's fees." *Id.* ¶ 141; *see also id.* ¶ 138 ("These false and misleading statements demean the quality of ADT's goods and services."). That's enough at this stage to make out a trade-slander claim.

The Defendants argue that the Plaintiffs fail to plead special damages. We disagree. "The level of specificity needed to plead special damages is a matter of federal law." *Benessere Inv. Grp., LLC v. Swider*, 2025 WL 2549979, at *10 (S.D. Fla. Sept. 4, 2025) (Ruiz, J.). And Rule 9(g) of the Federal Rules of Civil Procedure provides that, "[i]f an item of special damage is claimed, it must be specifically stated." FED. R. CIV. P. 9(g); *see also* 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1311 (4th ed. 2025) ("Rule 9(g) merely requires that special damages be 'specifically stated,' not that they be stated 'with particularity' as is required of allegations of fraud and mistake under Rule 9(b) or of denials of conditions precedent under Rule 9(c), a distinction that should be respected as being meaningful."). So, "special damages must be specially pleaded with some specificity in order to demonstrate the sufficiency of the plaintiff's claim for relief, particularly to defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) as well as to inform the defendant of the nature of the claim." 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1310

(4th ed. 2025). But, "[n]ormally, the dollar amount of the claimed special damages need not be set out in the body of the pleading." *Ibid.*

The AC (it's true) doesn't offer a specific numerical loss. But it doesn't need to. In claiming that ADT suffers "los[t] sales, profits, and good will," "attorney's fees," and "injury to its reputation with consumers," AC ¶ 141, the Plaintiffs fulfill the "primary purpose of Rule 9(g)"—namely, to "inform defending parties as to the nature of the damages claimed in order to avoid surprise; and to inform the court of the substance of the complaint." *Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 725 (4th Cir. 2014) (quotation marks omitted); *see also* Wright & Miller, § 1311 ("Most courts now take the position that allegations of special damage will be deemed sufficient for the purpose of Rule 9(g) if they are definite enough to notify the opposing party and the court of the nature of the damages and enable the preparation of a responsive pleading."); *Lord v. Univ. of Miami*, 2022 WL 18023293, at *6 (S.D. Fla. July 26, 2022) (Altonaga, C.J.) ("Accounting for Rule 26's early and considerable disclosure requirements, courts have trended toward a more lenient and practical reading of Rule 9(g).").

"'[S]pecial damages' generally means pecuniary loss." *Bothmann*, 458 So. 2d at 1170; *see also Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013) (Easterbrook, J.) ("It can be hard to know how specific is specific enough, but 'specifically' must be something less than the 'particularity' standard that Rule 9(b) prescribes for allegations of fraud. We need not probe the meaning of 'specifically,' because it is enough to identify a concrete loss."); *Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1155 n.6 (D.C. Cir. 1985) ("To state a claim, the plaintiff must allege *pecuniary harm* resulting from the defendant's unprivileged publication of false statements[.]" (emphasis added)). Given the purpose of Rule 9(g) and how Florida—and other courts—construe the special-damages requirement, Count V—alleging lost profits, reputational harm, and attorney's fees—survives the MTD. *See Jenkins v. Plaza 3000, Inc.*, 134 So. 3d 1127, 1131 (Fla. Dist. Ct. App. 2014)

(finding that a complaint "alleged sufficient special damages to proceed" by offering allegations about "the inability to obtain a conventional loan on the property, thus incurring increased loan costs and a higher interest rate; the loss of a contract to sell the property; the inability to lease the property; and damage to her creditworthiness"); *KLEO AG v. Rivada Networks, Inc.*, 148 F.4th 741, 748 (D.C. Cir. 2025) ("[T]he plaintiff adequately pleaded special damages by alleging that he lost business relationships close on the heels of a defamatory news story."). The Plaintiffs' objection to Count V is therefore **SUSTAINED**.

### c. Negligence

Count IX brings a negligence claim against Brinks. *See* AC ¶¶ 169–80. According to the Plaintiffs, "Brinks negligently breached its duties by," among other things, "[f]ailing to institute or adequately enforce policies and procedures prohibiting the use of ADT's proprietary business information and trade secrets in the course of converting customer accounts to Skyline/Brinks." *Id.* ¶ 174. The Magistrate Judge recommended that we dismiss Count IX with prejudice because "ADT does not allege that Brinks owes ADT a duty, which is a required element of negligence." R&R at 33. The Plaintiffs object, arguing that the AC "alleges that a duty was created and breached by Brinks because even after receiving numerous complaints about deceptive sales conduct and unlawful use of ADT's trade secrets, by both its own sales force and the sales force of its top dealer Skyline, it has continued to turn a blind eye and failed to take corrective action." ADT Obj. at 18; *see also id.* at 17 ("Florida recognizes that a legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others." (quotation marks omitted)). The Defendants counter that the AC fails "to plead a cognizable duty," which, "[u]nder Florida law," requires a "special relationship of the parties, a contract, or a violation of a specific statute created by the legislature"—conditions that are absent here. Def. Opp. at 15 (cleaned up); *see also ibid.* ("Here, Brinks indisputably had no interaction

with ADT—its competitor—that would create a 'special relationship' with ADT or otherwise give rise to a legal duty.").

We agree with the Magistrate Judge. "To state a claim for negligence under Florida law, a plaintiff must allege that the defendant owed the plaintiff a duty of care, that the defendant breached that duty, and that the breach caused the plaintiff to suffer damages." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1262 (11th Cir. 2001). "Of the four elements of a negligence claim, breach, causation, and damages are generally questions to be decided by the trier of fact," whereas "the determination of whether a duty is owed presents a question of law to be determined by the court." *Jackson Hewitt, Inc. v. Kaman*, 100 So. 3d 19, 28 (Fla. Dist. Ct. App. 2011); *see also Jenkins v. W.L. Roberts, Inc.*, 851 So. 2d 781, 783 (Fla. Dist. Ct. App. 2003) ("The duty element of negligence is a threshold legal question; if no legal duty exists, then no action for negligence may lie.").

"Under Florida law, the question of whether a duty is owed is linked to the concept of foreseeability." *Curd v. Mosaic Fertilizer, LLC*, 39 So. 3d 1216, 1227 (Fla. 2010). "[D]uties may arise from four general sources: (1) legislative enactments or administrative regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of a case." *Id.* at 1227–228. That last category "encompasses that class of cases in which the duty arises because of a foreseeable zone of risk arising from the acts of the defendant." *Id.* at 1228 (quotation marks omitted); *see also McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503 (Fla. 1992) ("The statute books and case law . . . are not required to catalog and expressly proscribe every conceivable risk in order for it to give rise to a duty of care. Rather, each defendant who creates a risk is required to exercise prudent foresight whenever others may be injured as a result. This requirement of reasonable, general foresight is the core of the duty element.").

The Plaintiffs argue that a duty arose here "from the general facts of the case." ADT Obj. at 17 (quotation marks omitted); *see also id.* at 18 ("Specifically, ADT alleges that Brinks breached a duty

owed to ADT by failing to institute or adequately enforce policies and procedures prohibiting the use of ADT's proprietary business information and trade secrets in the course of converting customer accounts" and "the use of any unfair or deceptive sales tactics[.]" (cleaned up)). We're not convinced.

To be sure, "[i]n Florida, when a defendant's conduct creates a foreseeable zone of risk, the law generally will recognize a duty to all within the zone placed upon the defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses." *Lewis*, 260 F.3d at 1263 (cleaned up). But a "duty is more likely to be imposed under the 'foreseeable zone of risk' standard under circumstances where the plaintiff has suffered personal or property damage." *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1339 (11th Cir. 2012). "Where the plaintiff seeks only the recovery of an economic loss, the duty element of negligence law serves as an important barrier to over-extension of liability." *Ibid.*

Our Plaintiffs allege an economic—not personal or property—loss. So, we must "consider whether the specific relationship between the plaintiff and defendant warrants imposing a duty on the defendant to protect the plaintiff's purely economic interests." *Id.* at 1340; *see also Monroe v. Sarasota Cnty. Sch. Bd.*, 746 So. 2d 530, 534 n.6 (Fla. Dist. Ct. App. 1999) ("In each of these [economic-loss] contexts, the relationship between the plaintiff and the defendant is the critical factor in determining whether a negligence cause of action exists . . . . Difficult economic loss cases all seem to examine the relationship between the parties to determine whether it warrants creating a duty to protect economic interests outside contract and statutory law."). Given that ADT and Brinks are competitors, however, no "special or fiduciary relationship exists." *Virgilio*, 680 F.3d at 1340 (quotation marks omitted); *see also Tank Tech, Inc. v. Valley Tank Testing, L.L.C.*, 244 So. 3d 383, 393 (Fla. Dist. Ct. App. 2018) ("[I]n order to proceed on a common law negligence claim based solely on economic loss, there must be some sort of link between the parties or some other extraordinary circumstance that justifies recognition of such a claim."); *Monroe v. Sarasota Cnty. Sch. Bd.*, 746 So. 2d 530, 531 (Fla. Dist. Ct. App.

1999) ("[W]e continue to hold, as a general rule, that bodily injury or property damage is an essential element of a cause of action in negligence.").

Not every grievance yields a claim for negligence. *See Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1124 (11th Cir. 2021) (Newsom, J.) ("[E]ven an actual, real-world harm, if unaccompanied by a violation of a recognized legal right, does not lay a foundation for an action[.]" (quotation marks omitted)). And the AC fails to provide "extraordinary circumstances which clearly justify" "expand[ing] the common law tort of negligence" to "protect a plaintiff's economic expectations." *Monroe*, 746 So. at 531. We thus **OVERRULE** the Plaintiffs' objection to Count IX, though we dismiss the claim *without* prejudice.[16]

### d. Unjust Enrichment

Count X brings an unjust-enrichment claim against Brinks. *See* AC ¶¶ 181–88. It alleges that Brinks "unjustly benefi[ ]ted (and continues to benefit) from the tortious acts committed by Defendants Skyline Arroyave, Haynes, Nuñez Hernandez, VanSlyke, Ramos, and Romero, including those defendants' misappropriation of ADT's trade secrets and civil conspiracy to do the same, as well as their deceptive sales tactics[.]" *Id.* at ¶ 184; *see also id.* ¶¶ 186–88 (alleging that "Brinks had actual or constructive knowledge" that the Skyline Defendants "were converting ADT customers using deceptive sales tactics" and that Brinks "voluntarily accepted or retained the proceeds of the ADT accounts generated . . . through illegal means").

---

[16] The Plaintiffs warn that "[a]dopting the recommendation of dismissal in the Report would . . . undercut the law of negligent hiring, training, and supervision for both independent contractors and employees." ADT Obj. at 18. But Count IX asserts a claim for *negligence*, not for "negligent hiring, training, and supervision." *Ibid.* Those discrete claims must be pled separately, not "nestled within [a] general negligence claim." *Anders v. Carnival Corp.*, 2023 WL 4252426, at *4 (S.D. Fla. June 29, 2023) (Altonaga, C.J.); *see also Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 980 (11th Cir. 2008) (explaining that a "shotgun pleading" contains "untold causes of action, all bunched together in one count contrary to the requirements of Federal Rule[ ] of Civil Procedure 10(b)").

The Magistrate Judge recommended that we dismiss Count X—with prejudice—because "ADT fails to sufficiently allege that ADT conferred a benefit on Brinks." R&R at 34; *see also ibid.* ("A review of the allegations in the [AC] reveal that ADT alleges no facts that it conferred a benefit on Brinks."). The Plaintiffs object, arguing that the R&R "fails to account for the fact that payments can pass through an intermediary, as part of an improper scheme, and still constitute 'direct benefits' for the purpose of an unjust enrichment claim." ADT Obj. at 19 (cleaned up); *see also id.* at 20 ("The harm to ADT is as acute for the indirect benefit Brinks received as it was for the direct benefit that Skyline gained in using ADT's name and brand to procure the account."). The Defendants respond that "ADT failed to satisfy the threshold requirement that it provided a 'direct benefit' to Brinks, in the form of commission fees or otherwise." Def. Opp. at 17. "At most," the Defendants insist, "ADT alleges that Skyline," "an independent contractor of Brinks," "benefited from stealing and misappropriating ADT's customer list," which (they say) "is not enough to plead that ADT directly conferred a benefit on Brinks." *Ibid.*

"Under Florida law, a claim for unjust enrichment is to prevent the wrongful retention of a benefit, or the retention of money or property of another, in violation of good conscience and fundamental principles of justice or equity." *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1101 (11th Cir. 2021) (quotation marks omitted). "A claim for unjust enrichment has three elements: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof." *Virgilio*, 680 F.3d at 1337. "[T]o prevail on an unjust enrichment claim, the plaintiff must *directly* confer a benefit to the defendant." *Kopel v. Kopel*, 229 So. 3d 812, 818 (Fla. 2017) (emphasis added).

The AC alleges that, "[a]s an authorized exclusive dealer of Brinks, Skyline ultimately sells the accounts it generates to Brinks" and that Brinks had "actual or constructive knowledge" of the

conspiracy to steal "trade secrets" and of the "deceptive sales tactics" that followed. AC ¶¶ 183–86. It further alleges that "Brinks was aware" that the Skyline Defendants "were targeting ADT's customers . . . with deceptive sales practices," that "Brinks continued . . . to acquire accounts" "[d]espite such knowledge," that "Brinks sanctioned and even incentivized Skyline's tactics by paying monetary bonuses to Skyline and some of its worst sales offenders," and that Brinks has no "intention of stopping its practice of ratifying and incentivizing the deceptive conduct by Skyline's sales force." *Id.* ¶¶ 34, 37, 90. After careful review, we find those allegations insufficient to plead an unjust-enrichment claim under Florida law.

To be sure, benefits "can pass through an intermediary, as part of an improper scheme, and still constitute 'direct benefits' for the purpose of an unjust enrichment claim." *Gilead Scis., Inc. v. AJC Med. Grp., Inc.*, 2021 WL 8534243, at *22 (S.D. Fla. Nov. 29, 2021) (Cannon, J.). But the AC alleges that Skyline, as "an authorized exclusive dealer for Brinks," "enters into contracts with residential consumers then, under the dealership arrangement, sells and assigns those contracts to Brinks for Brinks to provide service and generate revenue." AC ¶ 13. So, even if we read the AC as alleging that those sales and assignments were contractually mandated and thus inevitable, those allegations describe a third-party transaction, not the direct flow of an intermediary.

Consider Florida's direct-benefit caselaw. "One example in unjust enrichment cases of a benefit directly conferred on a defendant is where a tenant arranges with a contractor to improve real property but fails to pay for the work done; the contractor may maintain an action against the landlord/owner to recover for improvements made to the property which have enhanced the value of the premises." *Chiquita Fresh N. Am., L.L.C. v. Port Everglades Terminal, LLC*, 372 So. 3d 277, 281 (Fla. Dist. Ct. App. 2023) (quotation marks omitted). Another example comes from the products-liability context, in which "indirect purchasers have been allowed to bring an unjust enrichment claim against a manufacturer." *MacMorris v. Wyeth, Inc.*, 2005 WL 1528626, at *4 (M.D. Fla. June 27, 2005).

But "this Court has consistently found that the provision of medical services directly benefits a patient, not an insurer." *Vanguard Plastic Surgery PLLC v. Cigna Health & Life Ins. Co.*, 2024 WL 181552, at \*3 (S.D. Fla. Jan. 17, 2024) (Rosenberg, J.); *see, e.g., GVB MD v. Aetna Health Inc.*, 2019 WL 6130825, at \*6 (S.D. Fla. Nov. 19, 2019) (Moreno, J.) ("[A]s a matter of commonsense, the benefits of healthcare treatment flow to patients, not insurance companies, and as such, a third-party providing services to an insured confers nothing on the insurer except, a ripe claim for reimbursement, which is hardly a benefit." (quotation marks omitted)).

Even more to the point, the Florida Supreme Court has indicated that paying a corporation in which a defendant holds an ownership stake constitutes the kind of "indirect" benefit that cannot support an unjust-enrichment claim. *See Kopel*, 229 So. 3d at 818 (finding "no evidence of unjust enrichment because there was no evidence of a benefit being conferred directly to Respondents, rather than indirectly to corporations owned by them"); *see also Extraordinary Title Services, LLC v. Florida Power & Light Co.*, 1 So.3d 400, 404 (Fla. Dist. Ct. App. 2009) ("Plaintiff contracted with FPL, not Group, for electricity; Plaintiff paid FPL, not Group; and Group provided no services to Plaintiff. Based on these facts, which are not in dispute, the Plaintiff cannot allege nor establish that it conferred a direct benefit upon Group."); *Chiquita Fresh*, 372 So. 3d at 281 ("Chiquita's lease renegotiation with the County was wholly separate from the PET-Chiquita stevedoring relationship. PET did not participate in the lease renegotiation and it was not a party to Chiquita's relationship with the County. The County's lease with Chiquita was separate from Chiquita's business relationship with PET. Any benefit which Chiquita realized from its new agreement with the County was an indirect, tangential benefit of the Chiquita-PET relationship that did not flow directly to Chiquita from its dealings with PET.").

Surveying the caselaw leaves us with a guiding principle. Benefits that pass between "corporate entities that . . . are considered distinct from the persons (or . . . companies) that comprise them"— even in the case of "related entities"—are too far removed to be considered *direct*. *CFLB P'hip, LLC*

*v. Diamond Blue Int'l, Inc.*, 352 So. 3d 357, 360 (Fla. Dist. Ct. App. 2022); *see also Johnson v. Catamaran Health Sols., LLC*, 687 F. App'x 825, 830 (11th Cir. 2017) ("[T]he Johnsons say they conferred a benefit on Stonebridge by paying membership fees to Catamaran, who in turn paid premiums to Stonebridge. However, even if Stonebridge ultimately retained a portion of the Johnsons' membership payments, *Extraordinary Title* and *Kopel* indicate that the Johnsons conferred (at best) an indirect benefit on Stonebridge."); *Peoples Nat. Bank of Com. v. First Union Nat. Bank of Fla., N.A.*, 667 So. 2d 876, 879 (Fla. Dist. Ct. App. 1996) ("Here, the plaintiff, Peoples National, could not and did not allege that it had directly conferred a benefit on the defendants, the other participant lenders. In actuality, if any benefit was conferred upon each participant lender in the form of overpayments, it could only have been conferred upon them by Southeast, not Peoples National."); *AccessNinja, Inc. v. PassNinja, Inc.*, 2025 WL 2171606, at *14 (S.D. Fla. July 31, 2025) (Altman, J.) ("But the Counter-Plaintiffs admit that it was Bunsen, not PassNinja, that provided these assets to AccessNinja and HF0." (cleaned up)).

That principle counsels in favor of finding only an *indirect* benefit here. Skyline might be the "largest authorized dealer of Brinks." AC ¶ 182. But the companies are distinct, so any benefit Skyline confers on Brinks results from a degree of separation. *See id.* ¶ 183 ("As an authorized exclusive dealer of Brinks, Skyline *ultimately* sells the accounts *it generates* to Brinks." (emphases added)); *id.* ¶ 187 ("Brinks continues to *acquire* new additional accounts *from Skyline* despite its knowledge of Skyline's illegal practices." (emphases added)).

The outcome we reach today conforms with the Eleventh Circuit's interpretation of Florida law. *See Marrache*, 17 F.4th at 1102 ("As alleged in his amended complaint, Marrache and the other class members purchased bottles of Bombay from Winn-Dixie, not Bacardi. At most, Marrache has alleged that he and the other class members conferred an indirect benefit to Bacardi and, as such, cannot satisfy the first element of an unjust enrichment claim against Bacardi."); *Harvey v. Fla. Health Scis. Ctr., Inc.*, 728 F. App'x 937, 947 (11th Cir. 2018) ("Without demonstrating that the Hospital had

a legal responsibility to pay Mr. Harvey's medical expenses, Mrs. Harvey cannot show that she conferred a benefit on the Hospital by her reimbursing Medicare for those expenses."); *Virgilio*, 680 F.3d at 1337 ("Plaintiffs contend that they conferred a benefit on Defendants because Ryland was merely a pass-through conduit required to deliver the 1.5 percent fee to Defendants. We are unconvinced . . . . [T]o the extent that Ryland had no right to retain 1.5 percent of the sale prices of Plaintiffs' houses, it was because Defendants fulfilled their contractual duty to market Vista Lakes. If Ryland concluded that Defendants had not fulfilled their contractual duty, it could have refused to pay the fee and sued for breach of contract." (quotation marks omitted)).

Our outcome also complies with how courts *outside* Florida have applied Florida law. *See, e.g.*, *In re Evenflo Co., Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 707 F. Supp. 3d 103, 136 (D. Mass. 2023) ("Recent decisions from the Eleventh Circuit and Florida Court of Appeals have rejected Plaintiffs' theory that they conferred a direct benefit to Evenflo by paying a retailer who passed that revenue on to Evenflo."); *Miami Prods. & Chem. Co. v. Olin Corp.*, 2022 WL 3701159, at *2 (W.D.N.Y. Aug. 26, 2022) ("While *Kopel* was not decided in the antitrust context, it is an authoritative statement of Florida's highest court on the requirements of Florida's common law. Further, the Court agrees with the other federal courts that have concluded that an indirect purchaser has not conveyed a direct benefit on a defendant as required by Florida law."); *In re Namenda Indirect Purchaser Antitrust Litig.*, 2021 WL 2403727, at *36 (S.D.N.Y. June 11, 2021) ("Courts following *Kopel* have dismissed indirect-purchaser claims for lack of a "direct benefit" being conferred from an indirect-purchaser plaintiff to a defendant."); *Ct. Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc.*, 2024 WL 2106837, at *36 (D. Conn. Mar. 1, 2024) ("[C]ourts have generally ruled that medical service providers do not confer a *direct* benefit on an insurer by providing services to the insurer's members." (cleaned up)); *McCoy v. Samsung Elecs. Am., Inc.*, 2024 WL 3717299, at *6 (D.N.J. Aug. 8, 2024) ("Because Plaintiffs . . . both allege . . . that they

purchased their Chromebooks from a third-party retailer, rather than directly from Samsung, their Florida unjust enrichment claims are again dismissed.").

\* \* \*

This question has engendered some debate in our District. *See Vanguard Plastic Surgery PLLC*, 2024 WL 181552, at \*3 ("District courts in this Circuit are split on this very question[.]").[17] But "[t]he direct benefit requirement has been strictly applied by Florida courts." *Donoff v. Delta Air Lines, Inc.*, 2020 WL 1226975, at \*12 (S.D. Fla. Mar. 6, 2020) (Middlebrooks, J.). And the weight of authority, as it stands today, undercuts the Plaintiffs' position. *See SE Prop. Holdings, LLC v. Welch*, 65 F.4th 1335, 1342 (11th Cir. 2023) ("Because we are interpreting Florida law, we look first for case precedent from Florida's highest court . . . [and] predict how the highest court would decide this case . . . . [A]ll other data may be considered to the extent they indicate how the Florida Supreme Court might rule on an issue." (quotation marks omitted)).

Perhaps the Plaintiffs could've alleged that *Brinks* confers the benefit at issue here. *See, e.g.*, AC ¶ 37 ("Brinks' own direct sales representatives have also targeted ADT customers with widespread deceptive practices in the same manner as Skyline's representatives[.]"). But they didn't, and "a court may not serve as *de facto* counsel for a party to rewrite a pleading." *United States v. Cordero*, 7 F.4th 1058,

---

[17] *Compare CFLB P'ship, LLC*, 352 So. 3d at 360 ("[W]e recognize our decision in this matter may not be in accord with certain federal district court orders relied upon by Plaintiffs and the trial court. We are bound, however, by the Supreme Court's decision in Kopel and our own decision in Extraordinary Title Services[.]") *with Solidda Grp., S.A. v. Sharp Elecs. Corp.*, 2014 WL 12513613, at \*3 (S.D. Fla. Mar. 6, 2014) (Dimitrouleas, J.) ("[N]either the absence of direct contact . . . nor the existence of intermediaries in the flow of the subject benefits forecloses a claim of unjust enrichment."); *Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213, 1229 (S.D. Fla. 2009) (Marra, J.) (finding that "Defendant erroneously equates direct contact with direct benefit"); *Carriuolo v. Gen. Motors LLC*, 72 F. Supp. 3d 1323, 1326 (S.D. Fla. 2014) (Cohn, J.) ("It is of no matter that the benefit passed through independent dealerships."); *Ulbrich v. GMAC Mortg., LLC*, 2012 WL 3516499, at \*2 (S.D. Fla. Aug. 15, 2012) (Scola, J.) ("However, direct contact between Balboa and Plaintiff is not required to find that Balboa directly benefited.").

1068 (11th Cir. 2021) (quotation marks omitted); *see also Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 n.7 (11th Cir. 2006) ("A court is generally limited to reviewing what is within the four corners of the complaint on a motion to dismiss."). Count X instead alleges that "[i]t would be unjust and inequitable for Brinks to retain the proceeds of the ADT accounts *generated by Defendants Skyline, Arroyave, Haynes, Nuñez Hernandez, and VanSlyke*[.]" AC ¶ 188 (emphasis added). That's not enough. We therefore **OVERRULE** the Plaintiffs' objection to Count X, though we dismiss the claim *without* prejudice.

### e. The Trade-Secret and Civil-Conspiracy Claims

Finally, Counts I, II, and VIII bring trade-secret and civil-conspiracy claims against the Skyline Defendants (as well as Ramos and Romero). *See* AC ¶¶ 96–118, 162–68. The Magistrate Judge recommended that we find those Counts untimely, *see* R&R at 24–26, and so didn't pass on whether the AC adequately alleges FUTSA, DTSA, and civil-conspiracy claims. But, having found those three counts timely, we now confirm that they state viable claims for relief.

Let's start with Count I. The FUTSA "provides a cause of action for the misappropriation of trade secrets." *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1297 (11th Cir. 2018); *see* FLA. STAT. §§ 688.001–009. "To successfully state a cause of action under FUTSA, a plaintiff must allege that: (1) the plaintiff possessed secret information, (2) took reasonable steps to protect its secrecy, and (3) the secret it possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it." *Poet Theatricals Marine, LLC v. Celebrity Cruises, Inc.*, 307 So. 3d 927, 929 (Fla. Dist. Ct. App. 2020) (cleaned up). "A 'trade secret' includes any information, including a formula, pattern, compilation, program, device, method, technique, or process that derives independent economic value from not being generally known to other persons and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *AccessNinja*, 2025 WL 2171606, at *11 (cleaned up).

60

"A party can misappropriate another's trade secret by either acquisition, disclosure, or use." *Ibid.*; *see also ibid.* ("Misappropriation by use and misapplication by disclosure"— which "have nearly identical elements"—"occur when a person uses or discloses a trade secret 'without consent' and then either: (1) uses improper means to acquire the trade secret; (2) at the time of use knew or had reason to know that it was (a) derived from a person who used improper means, (b) acquired in a manner giving rise to a duty to maintain secrecy, or (c) derived from a person who owed a duty to maintain secrecy to the owner; or (3) before a material change in his position, knew or had reason to know that it was a trade secret and had been acquired by accident or mistake." (quotation marks omitted)).

The AC sufficiently pleads these FUTSA elements. *First*, it alleges that "ADT compiles and stores its data related to customer contracts including pricing, contract duration, the types of services purchased by certain customers, and notes related to the service provided to those customers by its own industry," that this information "is not publicly available," and that "ADT derives independent economic value from the fact that its proprietary business information, including the specifics of its customers and pricing model, are not known to competitors, including Skyline and Brinks, as competitors would misuse this information to try to improperly gain a competitive advantage." AC ¶¶ 98, 101. *Second*, it alleges that, "[a]t all times relevant to these claims[,] ADT has stored (and continues to store) this information electronically, and access to it requires a password and multi-factor authentication." *Id.* ¶ 99. *Third*, it alleges that "Ramos misused his employee computer credentials while he was still employed by ADT" and "accessed ADT proprietary business information, which he knew was proprietary, confidential, and password protected," that "Ramos sold ADT's proprietary business information to Defendants Skyline, Arroyave, Haynes, Nuñez Hernandez, and VanSlyke, who paid for this proprietary business information when they knew or should have known it had been unlawfully obtained," and that the Skyline Defendants "used" that information

"to target ADT's customers" and "to interfere with ADT's contracts with its customers." *Id.* ¶¶ 102–03, 106.

As to Count II, the "DTSA creates a federal cause of action that largely mirrors FUTSA." *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1311 n.13 (11th Cir. 2020); *see* 18 U.S.C. § 1836(b)(1) ("An owner of a trade secret that is misappropriated may bring a civil action."). Indeed, the DTSA's "definition of 'trade secret,' while not identical to FUTSA's definition, is substantially equivalent," and so we can "assume . . . that the substantive standard for misappropriation is identical under FUTSA and DTSA, at least as they apply here." *Compulife*, 959 F.3d at 1311 n.13. We thus needn't undertake a separate analysis of the DTSA claim and find that, for the reasons we explained above, the Plaintiffs state a viable claim under DTSA.

Lastly, as to Count VIII, we've already found that the Plaintiffs adequately state a civil-conspiracy claim. As we discussed above, pleading a civil conspiracy under Florida law requires alleging "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Raimi*, 702 So. 2d at 1284. And our Plaintiffs have done just that. They've alleged that the Skyline Defendants, Ramos, and Romero "agreed to engage in a conspiracy to steal and profit off ADT's proprietary business information and trade secrets in violation of the Defend Trade Secrets Act, the Florida Uniform Trade Secrets Act, and the common law of unfair competition." AC ¶¶ 163, 165; *see also Logan v. Morgan, Lewis & Bockius LLP*, 350 So. 3d 404, 412 (Fla. Dist. Ct. App. 2022) ("[I]n pleading conspiracy, the plaintiff must further identify an actionable underlying tort or wrong . . . because there is no freestanding cause of action in Florida for civil conspiracy."). They've alleged that Ramos "stole ADT's proprietary business information . . . and sold it to Defendants Skyline, Arroyave, Haynes, Nuñez Hernandez, and/or VanSlyke," who "used this unlawfully obtained proprietary business information to cause injury to ADT's business by

targeting ADT's customers" through "deceptive sales practices." *Id.* ¶¶ 167. And they've alleged that "ADT was injured by the conduct," suffering "millions of dollars of losses." *Id.* ¶ 36. We therefore find that Counts I, II, and VIII sufficiently state claims for relief.

## IV. Leave to Amend

One final point. The Magistrate Judge recommended giving the Plaintiffs leave to amend Counts I, II, and VIII, which the R&R found untimely, and Count V, which the R&R found insufficient to state a claim. But the Plaintiffs never requested that leave. Indeed, in objecting to the R&R, they appear to disclaim the need for a Second Amended Complaint. *See* ADT Obj. at 2 ("Although the Report gives leave to amend the complaint, further amendments should not be required because the operative pleading already establishes prima facie jurisdiction over such individuals.").

Federal Rule of Civil Procedure 15 provides that "[a] party may amend its pleading once as a matter of course within . . . 21 days after serving it." FED. R. CIV. P. 15(a)(1)(A). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(2). And, as the Eleventh Circuit has made clear, "filing a motion is the proper method to request leave to amend a complaint, and that . . . motion for leave to amend should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment." *Cita Tr. Co. AG v. Fifth Third Bank*, 879 F.3d 1151, 1157 (11th Cir. 2018) (cleaned up).

Our Plaintiffs have already amended their Complaint once as a matter of right. They haven't moved for leave to seek further amendments or suggested that the Defendants consent to any such leave. And the R&R recommended granting leave to amend counts that we find viable—not the ones we find fail to state a claim (*i.e.*, Counts IX and X). We thus see no reason to grant leave in these circumstances. *See Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) ("A district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the

plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court.").

CONCLUSION

After careful review, we **ORDER and ADJUDGE** as follows:

1. The Motion to Dismiss [ECF No. 100] is **GRANTED in part** and **DENIED in part**.

2. The Magistrate Judge's R&R [ECF No. 141] is **ADOPTED in part and REJECTED in part**.

    a. The Plaintiff's Objections to the R&R [ECF No. 142] are **SUSTAINED in part** and **OVERRULED in part**.

    b. Skyline's Objections to the R&R [ECF No. 143] are **OVERRULED**.

    c. Brinks's Objections to the R&R [ECF No. 144] are **SUSTAINED in part** and **OVERRULED in part**.

3. Counts III, IV, VI, and VII are **DISMISSED** to the extent they assert claims against Brinks for incidents predating June 17, 2020.

4. A new trial order, setting future deadlines, is forthcoming.

**DONE AND ORDERED** in the Southern District of Florida on February 27, 2026.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record

64